**UNITED STATES of America, Appellee,**

v.

**Guy Stephen WERTZ, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**George William VAUGHN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Thomas Jefferson CLYBURN, Appellant.**

Nos. 79–5276, 79–5277 and 79–5332.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1980.

Decided July 2, 1980.

O. W. Bannister, Jr., Greenville, S.C., for appellant in No. 79–5276.

Will T. Dunn, Jr., Greenville, S.C., for appellant in No. 79–5277.

Charles V. Bell and Donald James Sampson, Greenville, S.C., on brief, for appellant in No. 79–5332.

William A. Coates, Asst. U.S. Atty., Greenville, S.C. (Thomas E. Lydon, Jr., U.S. Atty., Greenville, S.C., on brief), for appellee.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

After trial and conviction under a narcotics charge, but prior to sentencing, counsel for the defendants orally moved the district court, for a new trial on the ground that certain testimony should have been suppressed, and alleged that the motion could not have been timely made under provisions of Rule 12(b)(3) because of lack of knowledge that the facts would reveal those matters disclosed at the trial. The motion was denied by the district court and this appeal followed. We affirm.

The facts leading to this prosecution are unusual to say the least. And they are made more so by the scantiness of the record itself. The parties apparently felt a need to have transcribed only that part of the trial record which involved directly the issues on appeal. The testimony of the witness characterized by the defendants as the key figure in the prosecution, Billie Sue Arrowood, was not transcribed, though, the jury arguments, as well as the opening statements of counsel, have been transcribed and included in the record. Neither was the testimony of the informer, assuming he testified (which is not clear) transcribed despite the importance of that testimony on the merits of the prosecution. We are accordingly largely dependent on this incomplete record for the theory of both the prosecution and the defense. It can only be assumed that counsel determined on the basis of the full record at trial that the evidence was sufficient to require the submission of the issue of guilt to the jury and that the sole possible basis for error was the admission of an alleged confession. This challenged admission arose out of a narcotics investigation by agents of the Drug Enforcement Administration centered in the Spartanburg, South Carolina, area. It began with the detailing of a narcotics undercover agent to that area in September 1978.

After he arrived in Spartanburg, the undercover agent, Rousseau, was put in touch with an informer, Rusty. Through Rusty he made contact with the defendants Wertz and Vaughn, whom Rusty identified as individuals he knew to be illegal drug dealers. As a result of this information Rousseau agreed with these two defendants to purchase from them half an ounce of heroin for a price later agreed to be $1,300.00. Rousseau, accompanied by Rusty, drove to a motel on the edge of Spartanburg, where he was to meet the defendants. When the agent arrived at the appointed place the defendants Wertz and Vaughn met him and told him that they would have to go to another spot to make contact with the defendants' sources.

Riding in the agent's car, the party, composed of Rousseau, Rusty, Wertz and Vaughn, began at this time an automobile trip under the direction of Wertz and Vaughn presumably to the home of the source. The trip ended at the mobile home of the defendant Clyburn in Rutherfordton, North Carolina. After some conversation with Clyburn, Wertz and Vaughn said that they had to meet the source without the agent or Rusty. They accordingly departed in Clyburn's car for the purpose of meeting the source and picking up the heroin, leaving the undercover agent and Rusty with Clyburn and his wife. A short time later, Wertz telephoned Rusty at Clyburn's trailer, but talked to the agent, expressing suspicion that the agent was an undercover police officer. Apparently satisfied, for the moment at least, with the agent's answers, the defendants indicated they were returning with the heroin.

When Wertz and Vaughn did return after an interval of about two hours, however, it was obvious that they were not entirely satisfied that the agent was not a police officer. They had noticed the decal on the

car the agent was driving, and they interrogated him at some length about how he got the car, and for whom he worked. They proceeded to search him, to examine his personal effects, such as his driver's license, and to check whether he was "wired." They seemed reassured by their search and proceeded to show the agent what they said was a half ounce of heroin, demanding at the same time the agreed price. The agent had Rusty, a long-time addict, examine the product; Rusty confirmed it as heroin. According to Vaughn, Rousseau thereupon gave them the agreed price, though Vaughn "ke[pt] the package [of heroin, as the Government contends, or of milk sugar, as the defendants contend] until [they] got back to South Carolina." [1]

The agent, Rusty, Wertz, and Vaughn returned to Spartanburg with Vaughn driving the agent's car. Wertz and Vaughn expressed some concern that they might be followed and Vaughn traveled a roundabout way, using little used roads, on the return. When they reached the motel where they had met initially in Spartanburg, Wertz and Vaughn got out of the agent's car, gave the agent a package purportedly containing the heroin, and drove off in their car with the understanding that they would meet back with the agent and Rusty at Rusty's house. Wertz and Vaughn proceeded to a place called "Williams Grill" and "'laundered" [or converted] the money given them by the agent.[2] The agent and Rusty in turn drove to Rusty's house, where the agent, in the presence of Rusty and Rusty's girl friend Billie Sue with whom he was living, made a field test of the contents of the package. As a result of this test he concluded that he had been given not heroin, but milk sugar.

The agent recognized that it was likely he had been "ripped-off." Wertz and Vaughn had his $1,300, and all it appeared that he had was milk sugar. The agent was uncertain how the "rip-off" had been managed. He entertained apparently some question whether Rusty was involved. Because of these suspicions of Rusty, Rousseau first ordered strict surveillance on a round-the-clock basis of Rusty's house, presumably in order to determine whether Vaughn and Wertz visited Rusty's house, and what they did, if either or both did visit Rusty's house. He next visited the local police headquarters, where he verified that the package given him contained only milk sugar. He took Rusty and began a search for Wertz or Vaughn. The agent drove to the neighborhood where Vaughn lived and began to check various spots Vaughn was likely to be seen. While he was in the parking lot of a convenience store in the neighborhood where Vaughn lived, he saw Vaughn drive up in a Cadillac automobile accompanied by a female companion. It was at this point that the sequence of events giving rise to the motion which is the basis of this appeal occurred.

Bitter that he had been mulcted out of $1,300 and no doubt embarrassed by the thought that he would have to report to his superiors how he had been duped by the defendants, Rousseau rushed over to the car where Vaughn was and, using some loud, obscene language, declared he had been "ripped-off." He demanded either the heroin or the return of the $1,300. Vaughn denied any knowledge of a "rip-off." Rousseau, obviously indignant at this disclaimer, renewed his demand, drawing his revolver. Vaughn proceeded to get out of his car, faced Rousseau, and gave him a "shove." The two also began to argue. Vaughn twitted Rousseau about his gun, ominously warning him that if he [Rousseau] harmed him [Vaughn], the former would not be allowed by his friends and relatives in the neighborhood to leave the lot alive. As if to give substance to this warning, a number of friends of Vaughn in the parking lot began to gather about him and Rousseau.

1.  Rousseau's testimony seems to some extent contrary to Vaughn's account, but, for purposes of Vaughn's appeal, we accept Vaughn's testimony.

2.  Vaughn gave two versions of the laundering operations. At one point in his testimony, he said he and Wertz effected the "laundering." At a later time, he testified Wertz was not present.

Vaughn testified that this group of friends wanted to "roughen him [Rousseau] up," but he indicated he sought to dissuade them. The whole situation became so threatening to Rousseau that, in Vaughn's words, Rousseau "panicked," put up his gun, and started to depart. As Rousseau was departing, Vaughn said he took Rousseau by the shoulders, shook him, and warned him never to do that again. Vaughn then walked with Rousseau toward the latter's car and in a friendly manner told him thereafter to deal directly with him when he wanted drugs and not through Rusty.

It was in the course of this encounter of Rousseau with Vaughn and during the time that Rousseau had his gun directed at Vaughn that the alleged confession was given. In reply to Rousseau's repeated demand for either the heroin or the money, Vaughn, according to his version of the statement, first said in a questioning way, "[t]hat's the case?" and then added, "[y]ou check with your partner, Rusty." Rousseau's story is somewhat different. He testified that Vaughn said, "We left the package at your man's house. It's your man that's ripping you off." It is this specific statement of Vaughn—whether taken as voluntarily testified to by Vaughn at trial without objection or as testified to by Rousseau, again without objection—that the defendants contend was subject to suppression as a coerced confession had a motion been timely made.[3]

After he left the parking lot following his encounter with Vaughn, Rousseau returned with Rusty to the latter's home. Billie Sue was still at the house. Rousseau told Rusty to have her get the package. She did so, saying Wertz had given it to her with instructions that it was for Rusty. On analysis, the contents of the package were found to be heroin. It was this heroin that the prosecution introduced at trial as the sub-

ject of the transaction between Rousseau and the defendants.

After the defendants were arrested on an indictment charging a drug violation arising out of the circumstances just detailed and before their trial, they filed a motion to suppress under Rule 12(b), but abandoned it before it could be heard. At trial, Rousseau and Vaughn gave the testimony relating to the encounter between Rousseau and Vaughn in the parking lot without objection. At the end of the trial, the jury returned a verdict of guilty against the defendants. Some two weeks later, the defendants filed their Rule 12(f) motion and for the first time raised the question of the inadmissibility of Vaughn's statement to Rousseau in the parking lot. The district court found that the defendants' showing did not warrant relief under 12(f). This appeal followed.

■ A motion under 12(f) is addressed to the discretion of the district judge and is to be disturbed only for clear error. *United States v. Williams,* (4th Cir. 1976) 544 F.2d 1215, 1217; *United States v. Meadows,* (5th Cir. 1975) 523 F.2d 365, 388, *cert. denied,* 424 U.S. 970, 96 S.Ct. 1469, 47 L.Ed.2d 738 (1976). We perceive no such error in the district judge's denial of the motion in this case. As the district judge emphasized in his written opinion, the defendants offered no valid excuse for their failure, prior to trial, to file their motion to suppress the statement of Vaughn. They knew from Vaughn the particulars of the encounter and his version of what had transpired during it, including Rousseau's drawing of his gun and Vaughn's statement to Rousseau. Moreover, long before trial, the Government had made its file available to the defendants. Included in that file was an account given by a Drug Enforcement Administration supervisor to whom Rousseau apparently reported. In this account, the supervisor set forth his summary of Rous-

---

**3.** Vaughn himself, however, did not appear to regard his statement as an admission of any participation in a rip-off, explaining that he just said "the first thing that popped in my mind, because Rusty was already, seemingly, out of it." Vaughn was undoubtedly seeking to shift blame from himself and Wertz to Rusty for any failure of the agent to obtain the heroin he had purchased. We shall, though, treat the statement in question as a confession and consider whether, as so regarded, it was coerced under the principles hereafter set forth.

seau's story of the investigation, including a report of what had occurred in the parking lot, and of the statement Vaughn made at that time. The defendants complain, however, that this account as set forth in the supervisor's report did not specifically state that Rousseau had drawn his gun. In the absence of any references to that circumstance by Rousseau, counsel for defendants assert that they considered it futile to make a motion to suppress simply on the basis of Vaughn's testimony with reference to Rousseau's gun. This excuse is not persuasive. Merely because the police officer may not support a defendant's story seems hardly to justify failure to file a motion to suppress on the basis of defendant's own account.

Furthermore, the defendants did learn before the trial commenced that Rousseau would testify that he had his gun out when Vaughn made the challenged statement. They received this information from the district attorney. It is true, this was on the eve of trial. It was, however, just as soon as Rousseau became available to the district attorney for interview.[4] If the sole reason the defendants had abandoned their motion to suppress was that they were uncertain whether Rousseau would support Vaughn's story, they thus knew before trial began that Rousseau would support it, and they could have, as the district judge observed, renewed their motion to suppress at that point and could later have preserved the point by objecting to the introduction of the statement at trial. The defendants did neither. The district judge suggests that they failed to do so because they perceived some strategic advantage in the admission of the statement. Whether this is true, the defendants' showing in support of their motion under Rule 12(f) was clearly insufficient, and the district judge did not commit clear error in denying the motion.[5]

The district court, after determining that the defendants had failed to meet the test for relief under Rule 12(f), proceeded "in fairness to the people" (meaning apparently the defendants) to give the defendants "a[n out-of-time] suppression hearing."[6] After that hearing, it concluded that there was no legal basis for suppressing the testimony. We agree.

A confession is involuntary[7] and subject to suppression when induced by such duress or coercion, express or implied, that the accused's "will has been overborne and his capacity for self-determination critically impaired," *Schneckloth v. Busta-monte*, (1973) 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, and his statement was not " 'the product of a rational intellect and a free will,' " *Mincey v. Arizona*, (1978) 437 U.S. 385, 398, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290.[8] Whether a confes-

---

4. Rousseau had been engaged in other pressing undercover activities at another location and could not be made available for interview either by the district attorney or the defendants until just before trial.

5. *United States v. Williams*, 544 F.2d at 1219; *United States v. Meadows*, 523 F.2d at 368.

6. *See United States v. Brown*, (D.C. Cir. 1980) 27 CrL. 2081.

7. The statement, which the defendants characterize as a confession, was actually an admission. The distinction between the two was stated in *United States v. Cobb* (D.S.C.1977) 448 F.Supp. 886, 893, *aff'd*. 568 F.2d 774 (4th Cir. 1977). ". . . a 'confession' is the direct acknowledgment of guilt whereas an 'admission' is a statement of pertinent facts which, in connection with proof of other facts tends to prove guilt." To the same effect, *see Gladden v. Unsworth*, (9th Cir. 1968) 396 F.2d 373, 375, n. 2. However, for purposes of the

rule of exclusion for involuntariness, "[n]o distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense." *Miranda v. Arizona*, (1966) 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694; *Iverson v. State of North Dakota*, (8th Cir. 1973) 480 F.2d 414, 424, n. 12, *cert. denied*, 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335. However, only admissions which show an element of guilt or "touch the fact of guilt," it seems, come within this rule. *Opper v. United States*, (1954) 348 U.S. 84, 91, n. 7, 75 S.Ct. 158, 163 n. 7, 99 L.Ed. 101; *cf. Guillory v. Wilson*, (9th Cir. 1968) 402 F.2d 34, 36. We have assumed that the statement in question here is, however, within the rule.

8. The use of the terms "voluntary" and "involuntary" in this connection has been criticized as lacking "precise definitions." Grano, *Voluntariness, Free Will, and the Law of Confessions*, 65 *Va.L.Rev.* 859, 860, n. 1 (1979).

sion is involuntary within this rule is a question of fact to be determined from "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047. The circumstances to be considered in resolving the issue include the setting in which the confession was obtained, the details of the interrogation itself inducing the confession, and, particularly, as *Schneckloth* puts it, "the characteristics of the accused" such as his youth, experience, education, maturity, or intelligence.[9] But none of these various factors is to be considered in isolation, nor may the determination rest solely upon any one circumstance, for it is significant that in all the decisions of the Supreme Court in which involuntariness was found, "none of them turned on the presence or absence of a single controlling criterion; [but] each reflected a careful scrutiny of all the surrounding circumstances,"[10] looking to an assessment of "the psychological impact on the accused," of all those circumstances and an evaluation "of how the accused reacted [to them]" in arriving at a determination whether the accused's confession was induced by conduct and conditions that deprived his confession of voluntariness.[11] Finally, it is important always to bear in mind that "the voluntariness of a confession cannot be equated to the absolute absence of intimidation," *Johnson v. Hall*, (1st Cir. 1979) 605 F.2d 577, 582, n. 8, for "[u]nder such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind," *Schneckloth v. Bustamonte*, 412 U.S. at 224, 93 S.Ct. at 2046, quoting from *Culombe v. Connecticut*,

(1961) 367 U.S. 568, 603–605, 81 S.Ct. 1860, 1879–1881, 6 L.Ed.2d 1037. As one commentator has put it:

> "The relevant question must be, as it usually is in the context of moral and legal responsibility, the degree of impairment of mental freedom that will excuse a defendant from accountability for his confession. Stated differently, we must inquire into the amount of pressure we justifiably can expect, or demand, a defendant to resist before we reach the legal conclusion that his freedom of choice was impaired."[12]

■ The defendants rest their argument that Vaughn's confession was involuntary solely on the one fact that Rousseau drew a gun on Vaughn during the time when the so-called confession was given by Vaughn. None of the factors found important on the voluntariness issue, other than that one fact, was present here. Thus, unlike practically every other case in which involuntariness was found, Vaughn was not in custody or under arrest at the time of his admission. Actually, so far as Vaughn knew, his confrontation was not with a police officer, acting in the performance of his official duties, but with an illegal drug trafficker just like himself, who had intended to participate in an illegal drug transaction. He was not at a police office or in a hostile or unusual environment. Rousseau was the stranger in the area where the encounter occurred, without any acquaintances or friends, if Rusty, drunk on drugs, is excepted. Vaughn, on the contrary, was in the very area where he lived and had many friends and relatives who quickly gathered around him as his argument with Rousseau

---

**9.** Earlier, in *Thomas v. State of North Carolina*, (4th Cir. 1971) 447 F.2d 1320, 1322, we had stated the issues to be whether the accused's "will was overborne by the sustained pressure upon him." We substantially repeated the same thought in *Ferguson v. Boyd*, (4th Cir. 1977) 566 F.2d 873, 877.

The first expression of the principle by the Supreme Court was in *Hopt v. Utah*, (1884) 110 U.S. 574, 585, 4 S.Ct. 202, 208, 28 L.Ed. 262, where the Court defined involuntary in the context of confessions as whenever the defendant

has been subjected to pressure sufficient to deprive him "of that freedom of will or self-control essential to make his confession voluntary within the meaning of the law."

**10.** *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047.

**11.** *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047.

**12.** 65 *Va.L.Rev.* at 883–884.

began. Vaughn was not an immature or inexperienced person of limited intelligence. He was a well-known drug dealer and as such he inevitably had encountered danger both from the law and from others engaged in the illegal trafficking of drugs. He knew well the ways of experienced criminals. He showed this by promptly "laundering" the currency given by Rousseau in purchase of the drugs. This was the action of one who was no stranger to crime or criminal activity.

The encounter had none of the aspects of a police interrogation, with its inherent compulsions. The statement by Vaughn was largely spontaneous. Nothing Rousseau said had actually solicited any statement from Vaughn. Vaughn's statement represented a taunting of Rousseau. He flippantly suggested to Rousseau that if there had been a "rip-off," it was Rousseau's own informant who was the culprit. Vaughn's very language, its rather insolent tone, carried little evidence of fright on Vaughn's part in making his spontaneous expression. We have already noted the circumstances that followed, during which the statement with which we are concerned was made. The person who "panicked" was not Vaughn, as Vaughn himself conceded, but Rousseau. Rousseau may have had a gun but he was surrounded by a hostile group, anyone of whom might have been armed. Vaughn, encircled by his friends, was in command of the situation.

■ The difficulty with the defendants' argument that the fact that Rousseau had drawn a gun rendered his statement involuntary is that that fact, standing alone, is not sufficient to establish involuntariness. *Reck v. Pate,* (1961) 367 U.S. 433, 440, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948, and *Thomas v. Arizona,* (1958) 356 U.S. 390, 400–401, 78 S.Ct. 885, 890–891, 2 L.Ed.2d 863, make that clear.[13] The critical issue is whether the act of Rousseau in drawing his gun had such an intimidating and overpowering effect on Vaughn that his will thereafter to resist Rousseau was overcome and overpowered to the extent that his statement was thereby rendered involuntary. The district judge, who saw the parties, heard their testimony, and observed their demeanor, had no difficulty in resolving this issue: he found that Vaughn was not so intimidated.[14] And, after an independent review of the record, as is proper,[15] we agree.

In both *Beecher, supra,* and *Brown v. Mississippi,* (1936) 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, in which a confession was found involuntary, and in *Boulden, supra,* in which a confession was found voluntary, the officers, it is true, had used a gun or guns or had simulated hangings in coercing a confession. But, unlike this case, the use of the guns or halters in those cases was but one factor or circumstance considered by the court on the issue of voluntariness. The court in *Beecher, Boulden,* and *Brown* looked first to the background of the accused. The accuseds were blacks, taken into custody in each instance by a group of white officers. In all of the cases, the police officers, using openly the powers of their positions and their weapons, were at-

---

**13.** *See Reck v. Pate,* 367 U.S. at 440, 81 S.Ct. at 1546:

"Physical mistreatment is but one such circumstance [to be considered on the issue of the voluntariness of a confession], albeit a circumstance which by itself weighs heavily."

Especially is this true when the party drawing the gun is not attempting, as were the officers in *Boulden v. Holman,* (1969) 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, and *Beecher v. Alabama,* (1967) 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35, to force or extract a confession out of an accused.

**14.** *Mincey v. Arizona,* 437 U.S. at 395, 98 S.Ct. at 2415.

**15.** A distinction between the resolution of testimonial conflicts and specific findings of fact, on the one hand, and determinations of the mental state of the accused at the time of the confession and assessment of its legal significance, on the other hand, has often been made. In the former case, findings of the district court as the trier of fact will only be disturbed on appellate review for clear error; in the latter case, the appellate court is less circumscribed in its review. *Culombe v. Connecticut,* 367 U.S. at 603–605, 81 S.Ct. at 1879–1881; *United States v. Lewis,* (4th Cir. 1975) 528 F.2d 312, 313; *United States v. Brown,* (6th Cir. 1977) 557 F.2d 541, 547–48.

tempting to force a confession out of the accuseds. In *Beecher* the accused had been shot in the leg by the officers as they pursued him over an open field. While he lay helpless on the ground, a police officer fired his pistol into the ground inches from the accused's ear and two other officers— one with a pistol and the other with a loaded rifle—pointed their guns against the accused's head, threatening that if he didn't confess they would kill him. Surrounded by unfriendly officers thus threatening to kill him and firing their guns about him, and without any counsel, friend, or relative about to aid or counsel him, he confessed. Unquestionably, his confession was involuntary.

In *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, the defendant, described in the opinion of the state court as an "ignorant negro," was taken by the sheriff to the house of the murder victim. After they arrived at the house, a crowd of white men gathered and began accusing the defendant of the murder. When the defendant refused to confess, the group, with the assistance of one of the police officers, seized and twice hung the accused by a rope from a tree limb, demanding that he confess. When the accused persisted in his refusal to confess, he was finally let down and taken back to his house. Three days later, two deputy sheriffs arrested the defendant and, diverting into Alabama, on the way to the jail, they began whipping severely the defendant and threatened him with continuing such beating until he confessed. That confession was found involuntary.

These cases are a far cry from this one. In this case, as we have said, Vaughn was not handcuffed and was not in the custody of hostile police officers. Rousseau never touched Vaughn. Vaughn, on the other hand, did shove Rousseau about according to Vaughn's testimony. Vaughn was not confronted, as were the accuseds in *Beecher* and *Brown*, by a hostile, threatening group. Rousseau was the one in a hostile and intimidating setting, and it was Rousseau,

according to Vaughn, who "panicked," not Vaughn. And, it is understandable why Vaughn, when confronted by Rousseau's gun, did not "react" with fear and trepidation. He had unquestionably faced similar danger before in his criminal activities as a drug trafficker, knew he was on his own turf, and felt confident in being surrounded by his own friends, who were ready and willing to protect him from harm.[16]

*Boulden v. Holman*, where the confession was found voluntary, was a much stronger case for the defendant than this case. The accused was arrested and one of the arresting officers, in demanding that the accused confess, told him that "he had been wanting to kill a nigger a long time" and he "throwed the rifle up like he was getting ready to shoot." When he did not confess under these circumstances, he was handcuffed and put in a police car, surrounded by a large number of white officers and an angry, threatening crowd, all white. The chief of police then asked him to confess, telling him that if he didn't confess, he (the chief) would not stop the officer who had earlier expressed his desire "to kill a nigger."

■ Like the district judge, we attach little significance to Vaughn's at-trial testimony that he was in a state of great fear at the time of his challenged statement. Any subsequent account by an accused of his prior subjective mental impressions and reactions which is always influenced by self-interest, is to be carefully scrutinized. *United States v. Robertson*, (5th Cir. *en banc* 1978) 582 F.2d 1356, 1366–67. The conduct of Vaughn at the time of his statement is a far more credible and reliable guide to the determination of the accused's reaction than his subsequent explanation, which has all the hallmarks of a self-serving after-thought. In this case, the reaction of Vaughn was not that of one whose will had been overpowered.

Accordingly, had the defendants timely made their motion to suppress the statement of Vaughn for voluntariness, the dis-

---

**16.** *See Thomas v. Arizona*, 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863.

trict judge properly ruled that it would have been denied. Thus, the defendants suffered no prejudice from the failure of their counsel to object to the admission of the challenged statement or from the failure to have moved to suppress such statement before trial.

Since the statement was properly admitted, there is no basis for a claim that the later discovery of the drugs at Rusty's house was tainted by an illegal confession.

The judgments of conviction are accordingly

*AFFIRMED.*