UNITED STATES of America, Appellee,

v.

**Walter Reed MARTINDALE, III, Appellant.**

No. 84–5329.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 11, 1985.

Decided May 21, 1986.

Rehearing Denied July 3, 1986.

Blair Howard (John Frank Leino, Howard & Howard, P.C., Alexandria, Va., on brief), for appellant.

Justin Williams, Asst. U.S. Atty. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., David B. Smith, U.S. Dept. of Justice, Washington, D.C., on brief), for appellee.

Before RUSSELL, PHILLIPS and MURNAGHAN, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is a bizarre case of mystery and high Mideastern intrigue reminiscent of a James Bond novel. We sketch the facts of the story only to the extent that they are necessary to an understanding of the issues on appeal.

The central figure in the case and the defendant on appeal is a former officer in the State Department. He served apparently in an intelligence capacity of some importance in both the Middle East and Vietnam. During this time, he enjoyed diplomatic status and traveled under a diplomatic passport. A few years before the incidents which led to his prosecution, he either resigned or was terminated from government service. According to his testimony, he then engaged in private trading, being associated with a Middle Eastern group in some nebulous or indefinite ventures never entirely disclosed. In connection with his employment with this group, he undertook a careful and extensive surveillance of a member of a prominent Saudi Arabian family, the Al-Fassi's, who resided on the outskirts of London. The defendant gave a number of reasons, none free of doubt, for the surveillance. He suggested at his English interrogation that his group was interested in inducing Mr. Al-Fassi to become a co-investor. He had early on, however, confided to a retired Government intelligence agent, Goodman, with whom he had worked while employed by the Government, that he had been asked by Sheik Ibrahim Al-Rawaf to arrange an assassination in London. He indicated that a "Prince Naif" was the financial backer of the enterprise. He requested Goodman to review the planning for what was described felicitously as "this operation." Goodman actually visited London with the defendant for this purpose. While there, Goodman contacted a Vietnamese Phuc, whom both Goodman and the defendant had known in Vietnam. The three met and the defendant indicated to Phuc that he (the defendant) might have some work for him and other Vietnamese in the area.

Sometime later, on returning to Alexandria, Virginia, the defendant told Goodman to ask Brookshire, a retired Army officer who had served with the two of them in Vietnam, to secure for him (the defendant) an Uzi semi-automatic or automatic gun of Israeli manufacture. The defendant explained he sought this gun for a foreign national who would be taking it permanently out of the United States. Brookshire secured the Uzi gun as requested and, with the assistance of another mutual friend, delivered it to the defendant at a meeting in Petersburg, Virginia. At this time, the defendant's story to Goodman was that the gun was intended for a bodyguard of Al-Rawaf. The defendant later telephoned Goodman from London, told him he had "the items," which Goodman understood to refer to the gun, and secured from him (Goodman) the name of the Vietnamese

individual whom they previously had seen in London. The defendant proceeded to communicate with Phuc and sought to engage him in his surveillance of Al-Fassi. The defendant allegedly used the word "kidnap" in connection with the intended surveillance, though the defendant denies Phuc's testimony on the use of the word "kidnap." Phuc did not initially understand the word "kidnap" according to his testimony but, having become suspicious of the defendant and his project, he consulted a Vietnamese friend who told him the meaning of "kidnap." Concerned, Phuc determined to consult Scotland Yard. He was instructed by Scotland Yard to maintain contact with the defendant.

On his next visit to Phuc's residence, the defendant brought with him an attache box, which he explained to Phuc contained a radio to be given to a friend in the Mid-East and which he wished to leave with Phuc for a couple of weeks. Phuc accepted the box but, as soon as the defendant left, he called Scotland Yard which took possession of the attache box, opened it and discovered both the Uzi gun, a .38 calibre revolver, and ammunition for both weapons. At this point, Scotland Yard determined to break the case.

Officers of Scotland Yard took the defendant into custody and, with defendant's consent and after giving him the appropriate warnings under British law, interrogated him at some length. The defendant made many statements during this interrogation. He was later formally charged and plead guilty to firearms possession. After being held for another thirty days, he was released and allowed to board a plane to the United States without any passports (they having been seized) but with authority to travel granted by the United States Embassy in London.

On arrival in the United States, the defendant was interviewed by the Customs authorities and about a week later he was interviewed by Special Agent Pederson of the Bureau of Alcohol, Tobacco and Firearms. This was followed by the indictment of defendant on nine counts. One count charged a conspiracy to violate the Gun Control Act of 1968; two counts charged the defendant with shipping a firearm in interstate commerce and in foreign commerce with intent to commit a felony; one count charged knowing receipt of an Uzi rifle in Virginia after having caused the rifle to be purchased outside Virginia; one count charged knowing delivery of a firearm to a common carrier for shipment in foreign commerce without written notice to the carrier; two counts charged unlawful use of a diplomatic passport; and, finally, two counts charged impersonating a State Department employee. After a trial he was convicted of seven of the counts and acquitted of two. Subsequent to sentence, he appealed the judgment of conviction.

The defendant's principal objections on appeal are directed at the admission in evidence of (1) the personally signed transcript of his interviews by British officers at Scotland Yard in London, (2) of his interview with the Customs officers when he returned to the United States after his British prosecution, and (3) of his interview at his own office by Officer Pederson. We shall consider in their order these several objections first.

■ In their interrogation of the defendant, the British officers were engaged in the lawful pursuit of a separate and valid investigation into activities involving a violation of British law and conducted in compliance with British law. Of this there seems to be no dispute. Before the interrogations began, the British officers gave the customary British caution, advising the defendant that "he needn't say anything unless he wished to do so, but what he did say would be taken down in writing and may be given in evidence." There was no requirement on the part of the British officers of compliance with the rule either in *Miranda v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and any admissions made by the defendant in the interviews by the British officers were admissible absent proof of duress or of a wilful

**1132**

attempt of American authorities to evade the strictures of *Miranda* or *Massiah* by employing the foreign authorities. *United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983). The reason for such rule was stated in *United States v. Chavarria,* 443 F.2d 904, 905 (9th Cir.1971):

> *Miranda* was intended as a deterrent to unlawful police interrogations. When the interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has little or no effect upon the conduct of foreign police. Therefore, so long as the trustworthiness of the confession satisfies legal standards, the fact that the defendant was not given *Miranda* warnings before questioning by foreign police will not, by itself, render his confession inadmissible.

The district judge held an evidentiary hearing on the issue of duress in connection with the British interviews and, after such hearing, found no duress. That finding of the district judge is reversible only for clear error. *United States v. Dodier,* 630 F.2d 232, 236 (4th Cir.1980). The ruling of the district judge against duress was not clearly erroneous. It must be noted that the defendant is a well-educated, sophisticated individual with wide experience in the intelligence field. There is no reason to assume he was unaware either of his rights or of his surroundings. He had undoubtedly participated in investigations himself and suffered under no handicaps of inexperience, immaturity, or impaired competency. When asked if he would talk to the British officers, he had readily agreed. The interrogation was cordial throughout. Further, it must be remembered that the entire interrogation was typed and the defendant was given the opportunity to read it and verify the accuracy of the transcript. He did that and he signified his agreement with all the statements in the transcript by signing the transcript without any reservations.

The only fact that the defendant adduces in support of his argument of duress is that during the interrogation he was denied the right to use a telephone. One of the British officers explained the reason for this denial and his explanation was accepted by the district judge as reasonable and credible. The denial of the use of a telephone was clearly not intended by the British officers to coerce the defendant. The facts being developed in the investigation indicated an extensive plot either to murder or kidnap an individual. Manifestly there were other parties necessarily involved in the operation in addition to the defendant. The officer feared that, if the defendant were allowed to use the telephone, the defendant might communicate with his confederates and alert them that the officers had discovered the plot and had placed him in custody. The result of such premature discovery could well thwart the officers' ability either to prevent the crime or to apprehend and arrest others involved.[1] Such reason appears reasonable. Plainly the denial was not intended to coerce the defendant nor, in the opinion of the district judge, did it coerce him. We, therefore, affirm the district court's rejection of the motion of the defendant to suppress the transcript of the defendant's British interrogation either under the *Miranda* rule or for duress.

■ The defendant further objected to the introduction of his British interrogation because the statements given by him during the interrogation were not confessions but were in fact simply denials of wrongdoing and therefore exculpatory. As such, he urges they were inadmissible. We, however, have often held that exculpatory statements of the defendant, if shown to be false and fabricated, "are clearly admissible to prove [the defendant's] guilty state of mind," and as "evidence of guilt," of "illicit intent" and of "consciousness of

---

1. There is a statement in the record that the entire operation unraveled as a result of the investigation of the defendant, leading to the indictment in England of the defendant's associate, Ibrahim Al-Rawaf.

guilt." [2]   *United States v. Hughes,* 716 F.2d 234, 240–41 (4th Cir.1983); *United States v. Williams,* 559 F.2d 1243, 1249 (4th Cir.1977); *United States v. Abney,* 508 F.2d 1285, 1286 (4th Cir.), *cert. denied,* 420 U.S. 1007, 95 S.Ct. 1451, 43 L.Ed.2d 765 (1975); *United States v. Wilkins,* 385 F.2d 465, 472 (4th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1144 (1968).   To the same effect are the decisions of other circuits. *United States v. Meyer,* 733 F.2d 362, 363 (5th Cir.1984), and cases therein cited.

■ The defendant offered as a further objection to the admission of the transcripts the references to statements made by Phuc in the questions addressed to the defendant by the British agents. These transcripts were offered after Phuc had testified and, so far as they related to Phuc's testimony, were similar to his earlier testimony at trial. · It is the defendant's objection that this repetition of Phuc's testimony in the phraseology of the agents' questions represented an impermissible attempt to bolster the credibility of Phuc's testimony and, as such, was inadmissible under the rule stated in *Dowdy v. United States,* 46 F.2d 417, 424 (4th Cir.1931):

> [T]here can be no doubt that in modern times the general rule is that a witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony.[3]

The defendant, however, overlooks that this evidence was not offered to bolster or corroborate Phuc's testimony, but was offered and admitted merely "to put the question [then being answered] by the defendant in context," in short, indicating what he was responding to. That was the sole purpose of including any reference to

Phuc in the questioning. The district judge carefully cautioned the jury that it was "not to accept the truth of [such statement] as what Phuc did actually say." That instruction was given at the instance and on the request of the defendant. We find no error here.

■ The admissibility of defendant's statements to the Customs agent, Fanning, and to the DEA agent, pederson, is also questioned by the defendant on this appeal because those statements were secured without giving the defendant the *Miranda* warnings. The flaw in this argument is that on neither occasion was the defendant *in custody.* *Miranda* is applicable only in cases where the defendant is in custody. *Rhode Island v. Innis,* 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980). In both interviews the defendant freely consented to answer the agent's questions. He was thus under no restraint; he was subjected to no coercive action, either in word or deed. He was at liberty to terminate the discussion and to go his way anytime he chose to leave. He was neither under arrest nor in any type of custodial situation in either case. In fact, the Pederson interview was in the defendant's own office. The district judge found that the defendant's voluntary statements made under those circumstances were admissible.

It is defendant's position, though, that the Pederson interview was actually sufficiently custodial to require *Miranda* warnings since at the time, the defendant was the target of a grand jury investigation. Pederson denied that the defendant was known to him to be a target of a grand jury investigation. At the time of the interview, he knew no more of the defendant's involvement than was set forth in a recent article in the *Washington Post* and that he

---

**2.** The court in *United States v. Di Stefano,* 555 F.2d 1094, 1104 (2d Cir.1977) said:

> False exculpatory statements are not admissible as evidence of guilt, but rather as evidence of consciousness of guilt.

This is contrary to the rule as stated by us in *United States v. Williams, supra,* and in *United States v. Abney, supra.* However, *Di Stefano* did not find the evidence of false exculpatory statements inadmissible; its ruling related only to

jury instruction on the effect to be given such evidence. The instruction of the district judge on the weight to be accorded such evidence is not in issue in this case and *Di Stefano* is therefore not apposite.

**3.** *See* in this connection, our opinion in *United States v. Parodi,* 703 F.2d 768, 785–87 (4th Cir. 1983).

had been given a subpoena to serve on the defendant. He inquired of the defendant about the article. The defendant proceeded unhesitatingly to give the same story he had already given the British officers and Mr. Fanning. It was, also, the same story the defendant gave in a later interview when his attorney was present. We find no error in the finding of the district judge that the defendant's statements, statements already proved by other witnesses, as given to Officers Fanning and Pederson, were entirely voluntary. *See United States v. Olmstead,* 698 F.2d 224, 226–27 (4th Cir.1983); *United States v. Wertz,* 625 F.2d 1128, 1133–35 (4th Cir.), *cert. denied,* 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980).

■ The defendant has advanced the argument that his conviction under the conspiracy count (Count One) is inconsistent with his acquittal under the substantive counts (Counts Two and Four) and, therefore, must be voided. Implicit in this contention is the assumption that the conspiracy offense is the same as the substantive offenses in Counts Two and Four. The initial fallacy in this argument is its failure to recognize that the offense of conspiracy is a separate and distinct offense from the substantive offense or offenses and that one can be validly convicted under a conspiracy count even though acquitted of the substantive offense or offenses. *Iannelli v. United States,* 420 U.S. 770, 777–82, 95 S.Ct. 1284, 1289–92, 43 L.Ed.2d 616 (1975). As the Court said in *United States v. Goldberg,* 756 F.2d 949, 958 (2d Cir.1985): "A substantive offense and a conspiracy to commit that offense are separate and distinct crimes (citing cases). A defendant thus may be convicted of the crime of conspiracy even if the substantive offense was not actually committed." It has long been the rule that inconsistency is not a ground for voiding a verdict of conviction. There may be a number of reasons why a jury may reach what may appear to be inconsistent verdicts but, so long as the evidence clearly supports the guilty verdict, inconsistency is no ground for invalidating the conviction. This was authoritatively settled by the Supreme Court in *Dunn v.*

*United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932), quoted and followed by us in *United States v. Harris,* 701 F.2d 1095, 1103 (4th Cir.), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983):

Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment....

The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

Finally, the defendant premises his contention in this regard on the assumption that the only substantive offenses related to the conspiracy are those charged in Counts Two and Four. This is in error. The conspiracy count charged had as its purpose the violation of various sections of the federal firearms statute. These violations were broadly divided into two groups: one dealt with foreign commerce, that is, with the transportation by air of the firearm from Alexandria, Virginia, to London, England; the second involved the transaction in interstate commerce as charged in Counts Three and Nine. The defendant was acquitted of the foreign commerce counts but—and this is what the defendant would disregard in his argument—he was convicted under all the substantive counts relating to interstate commerce. It is well settled that, where there is a conspiracy to violate two or more alleged criminal statutes, the jurors may properly convict if they find that the defendant conspired to violate any one of the statutes. This principle has been clearly stated in *United States v. Wilkinson,* 601 F.2d 791, 796 (5th Cir.1979):

A single conspiracy may have several objectives (citing cases). When a conspiracy to violate two statutes is alleged, the jury may find the defendant guilty if they believe beyond a reasonable doubt

that he or she conspired to violate either one of the statutes.

It follows that, even if conviction on at least one of the substantive counts was essential to a conviction of conspiracy in this' case (a conclusion which, incidentally, we have already found incorrect), there was such a conviction and the conspiracy conviction would not be vulnerable to attack.

There is some suggestion by the defendant, too, that the conspiracy conviction must be voided because there was a lack of proof of the commission of a murder. As *Goldberg, supra,* makes plain, proof of the commission of a murder is not required for conviction under the conspiracy count. The defendant was not charged with murder; he was indicted and convicted of conspiracy, as the district judge correctly declared in overruling this point raised by the defendant at trial.

■ Finally, the defendant assails his conviction of impersonating a federal officer or employee in violation of 18 U.S.C. § 912. The defendant used his diplomatic passport not only in passing through Customs in London, England, but also in identifying himself on at least three occasions when registering at London hotels as being with the "State Department," in presenting his diplomatic passport and asking for a discount as a U.S. State Department employee at Hertz Rent-A-Car at Gatwick Airport in England, and in receiving as such an employee a twenty-five per cent discount. This conduct on his part met the two-pronged test for conviction under section 912 as phrased in *United States v. Parker,* 699 F.2d 177, 178 (4th Cir.), *cert. denied,* 464 U.S. 836, 104 S.Ct. 122, 78 L.Ed.2d 120 (1983). *See also United States v. Cohen,* 631 F.2d 1223 (5th Cir. 1980), *rehearing denied,* 636 F.2d 315 (1981); *United States v. Robbins,* 613 F.2d 688 (8th Cir.1979); and *United States v. Hamilton,* 276 F.2d 96 (7th Cir.1960).

For the reasons stated herein, we affirm the rulings of the district court and the defendant's conviction under the indictment.

AFFIRMED.