**UNITED STATES of America,**
**Plaintiff,**

v.

**Philip Martin COOPER, Defendant.**

**No. 2:99CR138.**

United States District Court,
E.D. Virginia,
Norfolk Division.

May 30, 2000.

James A. Metcalfe, United States Attorney's Office, Norfolk, VA, for plaintiff.

James O. Broccoletti, Zoby & Broccoletti, Norfolk, VA, for defendant.

### ORDER AND OPINION

FRIEDMAN, District Judge.

On October 26, 1999, defendant filed a Motion to Suppress. In March of 2000, new counsel was appointed, and a new Motion to Suppress was filed on March 24, 2000. Defendant filed a Motion to Dismiss on April 12, 2000. On May 1, 2000, the Court conducted a hearing on the pending motions. The Court **DENIED** the defendant's Motion to Dismiss, and at the conclusion of the hearing, defense counsel raised for the first time an objection to the execution of the search warrant on the grounds that there was a "no knock" entry without justification. The Court continued the hearing until May 12, 2000, to permit additional briefs and evidence. At the hearing on May 12, 2000, the Court **DENIED** the defendant's Motions to Suppress with regard to both the evidence seized and the statements given. Following the Court's ruling on the motions, the defendant entered a conditional plea of guilty to Counts One and Two of the indictment, reserving his right to appeal the denial of defendant's Motions to Suppress, Motion to Dismiss, and the Court's jurisdiction on the basis that the defendant's name was spelled in capital letters in the indictment. The above motions were denied for the reasons stated on the record and for the reasons set forth below.

## FACTUAL AND PROCEDURAL BACKGROUND

In March of 1999, Detective E.M. Cruz of the Virginia Beach Police Department ("VBPD") began an investigation of the defendant after Cruz received information from a confidential informant, who had previously provided reliable information, stating that defendant was growing marijuana inside his residence at 1650 Fairfax Drive in the City of Virginia Beach. On March 17, 1999, Detectives Cruz and Carroll met with the informant and had him make a controlled purchase of marijuana from the defendant inside the residence at 1650 Fairfax Drive. The informant also notified the detectives that defendant was in possession of a firearm and had shown it to him in the residence. The informant told them that the defendant normally slept in the house during the day and conducted his distribution business at night. The detectives corroborated a number of details provided by the informant, including the vehicles registered to the defendant and to Deborah Bautista, the defendant's girlfriend, by independent surveillance and record checks.

On March 19, 1999, officers of the VBPD Special Investigative Division (SID) applied for and obtained a search warrant for the residence located at 1650 Fairfax Drive. *See* Govt.Exh. 1. The affidavit in support of the warrant submitted to the magistrate did not contain the information that a handgun had been seen in the defendant's possession at the residence referred to in the warrant. *See id.* The affidavit in support of the warrant did state that the defendant had a criminal record including arrests for the following: dangerous drugs, possession of marijuana, possession of methamphetamine, aggravated assault on a police officer, resisting arrest, and possession of a firearm by a felon. *See id.*

Due to the defendant's criminal history, the known presence of at least one pistol at the residence where defendant was conducting his marijuana grow operation and distributing drugs, and the hazards of executing search warrants where drug dealers are armed, Cruz sought the assistance of the Special Operations Division's SWAT Team in the execution of the warrant. In preparation for the execution of the warrant, Cruz drafted an operations briefing sheet for the narcotics officers. *See* Govt. Exh. 6. In the section entitled "Additional Information/Caution Statement," Cruz noted the following:

> SWAT Team Entry, Suspect # 1 has a history [of] assaulting Police Officers, Resisting Arrest & Firearms Violations. He also has a history of Law Suits against Police Officers. He has been arrested for Meth., Marij., and is possibly a heroin [user]. No dogs; No children.

*Id.*

Cruz's briefing sheet was incorporated into the SWAT Team's "Raid Plan," prepared by Sgt. K.A. Miller, the supervisor for the SWAT team raid on the residence located at 1650 Fairfax Drive. *See* Govt. Exh. 7. Miller stated in the Raid Plan that it was his intent to "execute the operation safely and quickly." *Id.* The Raid Plan noted that the suspect had an arrest history for drug sales and firearms and was expected to be armed with a "handgun." *See id.* A risk assessment sheet listed factors that received consideration, including the following: the search warrant was for drugs, the suspect had a history of crime against persons, the suspect had a history of violent crimes against police, and firearms were expected to be present and readily available. *See id.* In Sgt. Miller's opinion, the presence of firearms in the residence and the defendant's criminal history were of equal importance in assessing the risk involved in the execution of the search warrant.

On March 19, 1999, the SWAT Team and SID executed the search warrant. They announced their entry on a bull horn simultaneously with making a forced entry and using a "light and sound device." They quickly subdued the defendant. De-

fendant was arrested and advised of *Miranda* rights from a preprinted form. Defendant.responded, "Those ain't rights, but I understand them." Govt.Exh. 5. When asked if he wanted to talk with the detectives, defendant stated, "Isn't anything to talk about, is it?" *Id.* Defendant then proceeded to answer the detectives' questions.

During the interview, Cruz stated to the defendant, "if you wanted to cooperate with us, maybe in some other matters that could assist you in this situation, I'm not gonna make promises on how or ... what degree that would assist you...." *Id.* Cruz also informed the defendant that at the moment of the interview, he had "discretion" to bring the charges against the defendant. *See id.* Defendant was further informed that the detectives were not interviewing him in an attempt to get a confession, and the detectives stated, "We don't need a confession." *Id.*

Defendant stated that he lived at 1650 Fairfax Drive with his girlfriend Deborah Bautista.[1] Defendant was asked if he was a convicted felon, to which he responded, "I think that's the way the record would reflect." Govt.Exh. 3. Detectives asked defendant if he was growing a large amount of marijuana. He did not deny growing the marijuana and stated that he did not think it was a large amount. Defendant denied owning or possessing three handguns found inside the apartment. One was found in his bedroom between the mattress and box-spring on the side of the bed. Defendant acknowledged that his fingerprints would probably be found on the gun. Defendant stated he accepted responsibility for everything and that his girlfriend had no part in the activities. SID detectives conducted a search of the residence and located an indoor marijuana grow operation. They recovered 139 marijuana plants plus un-

packaged and packaged marijuana, as well as heroin and psilocybin. A loaded handgun and a second handgun were located in the master bedroom, and a third handgun was found in another bedroom. Some of the evidence was recorded on video tape and photographed as it was collected and maintained. Cruz appeared before a magistrate and obtained arrest warrants on defendant for various drug and firearm charges.

On March 19, 1999, defendant was arrested on state charges for Manufacture of Marijuana, Possession of Marijuana with Intent to Distribute Over Five Pounds, Possession of Heroin, Possession of a Firearm by a Convicted Felon, and Possession of a Firearm with Heroin. Defendant was denied bond. On March 26, 1999, the drugs retrieved during the search were sent to the state laboratory for analysis. In April 1999, information was requested on defendant's criminal history, and a firearms trace was conducted. In June 1999, defendant's case was ready for prosecution. The case was referred to the United States Attorney on June 24, 1999, for prosecution under the Project EXILE, a joint federal, state, and local task force targeting armed criminals.

On August 20, 1999, Deborah Bautista offered testimony before a federal grand jury, and defendant was indicted by the grand jury on three felony counts: possession of a firearm by a convicted felon, possession of marijuana with the intent to distribute, and possession of a firearm in furtherance of a drug trafficking crime. Defendant was arrested and had his initial appearance on the federal charges on October 6, 1999, at which time the government moved for detention. This Court appointed Robert E. Frank to represent defendant. The detention hearing was continued from October 8, 1999 to October

---

1. Bautista later agreed to cooperate with the government and stated that she and the defendant lived alone, and he gave her two hundred dollars per month. She stated that she knew the defendant was growing marijua-

na and selling it to people. She had even given his customers marijuana and accepted money for the defendant when he was not available.

13, 1999 on defendant's motion. At the detention hearing on October 13, 1999, defendant was ordered detained. Defendant was arraigned, and trial was set for December 14, 1999.

On October 26, 1999, defendant, by counsel, filed a Motion to Suppress. On November 12, 1999, defendant, on his own behalf, filed a "Notice of Termination of Counsel," which was construed as a motion to obtain another court-appointed attorney on the basis of "irreconcilable differences" with Mr. Frank. On November 23, 1999, this Court conducted a hearing on defendant's Motion to Terminate Counsel. At the hearing, defendant conveyed that he did not wish to proceed *pro se* but wanted counsel whom he considered to be "competent." In an Order filed on November 29, 1999, this Court denied defendant's motion. The Court was unable to address the Motion to Suppress at that time, as defendant had refused to cooperate with his attorney.

On December 2, 1999, Mr. Frank filed a motion to withdraw as counsel, and on December 6, 1999, the Court conducted a hearing on the motion. Based on the Court's observations of defendant's conduct at the hearings on November 23, 1999 and December 6, 1999, an Order was entered under 18 U.S.C. § 4241 directing the Attorney General to take custody of the defendant for the purpose of performing psychiatric and psychological evaluations of the defendant to determine his competency to stand trial. By a report dated February 3, 2000, the psychiatrists and psychologists of the Bureau of Prison's informed the Court and counsel of their determination that defendant "is not suffering from a mental illness or defect which renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." A competency hearing was held on March 13, 2000, at which time this Court found defendant competent to stand trial. The Court then considered defense counsel's motion to withdraw and concluded that while there was no legally sound basis requiring withdrawal of counsel, the motion was granted, and James Broccoletti was subsequently appointed to represent the defendant.

On March 22, 2000, defendant appeared with his new counsel, and a new trial and motions schedule was set. Trial was scheduled for May 15, 2000 by agreement of counsel. On March 23, 2000, defendant, by counsel, filed a motion to suppress statements allegedly taken from defendant in violation of his *Miranda* rights. On April 12, 2000, defendant, by counsel, filed a Motion to Dismiss the indictment on the grounds of an alleged violation of the Speedy Trial Act, 18 U.S.C. § 3161. In support of the motion, counsel attached a copy of a letter dated March 30, 2000, handwritten by the defendant.

## ANALYSIS

### I. Motion to Dismiss

The Speedy Trial Act provides for trial within 70 days from the date a defendant appears before a judicial officer. *See* 18 U.S.C. § 3161(c)(1). The Speedy Trial Act specifically provides exceptions for numerous types of delays, including:

(H)(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

(A) delay resulting from any proceedings, including examinations, to determine the mental competency or physical capacity of the defendant;

＊　　＊　　＊　　＊　　＊　　＊

(F) delay resulting from any pretrial motion through the conclusion of the hearing on, or other prompt disposition of, such matter;

＊　　＊　　＊　　＊　　＊　　＊

(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the de-

fendant is actually under advisement of the court.

18 U.S.C. § 3161(h).

The Supreme Court in *Henderson v. United States*, 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986), held that "Congress intended subsection (F) to exclude from the Speedy Trial Act's 70-day limitation all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is 'reasonably necessary.'" *Id.* at 330, 106 S.Ct. 1871. In *United States v. Parker*, 30 F.3d 542 (4th Cir.1994), the Fourth Circuit stated the following with regard to the Supreme Court's holding in *Henderson:*

> [T]he Court suggested that every provision in § 3161(h)(1)—including subparagraph (J)—automatically excludes periods of delay resulting from pretrial proceedings and therefore requires no inquiry into the reasonableness of the delay. Indeed, speaking specifically of subparagraphs (F) and (J), the court stated that Congress "exclude[d] automatically all the time prior to the hearing on a motion and 30 days after the motion is taken under advisement."

*Id.* at 549.

■ The Speedy Trial Act is not implicated until a defendant is either taken into federal custody on federal charges or indicted on those charges. *See United States v. Thomas*, 55 F.3d 144, 148 (4th Cir.1995).

■ Although the Motion to Dismiss was based on the Speedy Trial Act, defendant's letter attached to the Motion also refers to his rights under the Sixth Amendment. To establish a violation of his constitutional right to a speedy and public trial, the defendant must show that on balance, four separate factors weigh in his favor: 1) if the delay prior to trial was "uncommonly long;" 2) if the defendant or the government is more responsible for the delay; 3) if the defendant, in due course, asserted his right to a speedy trial; and 4) if the defendant suffered prejudice as a result of the delay. *See Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

■ Defendant first appeared before this Court on October 6, 1999, at which time the government moved for detention. That motion was determined October 13, 1999. On October 26, 1999, defendant, by counsel filed a Motion to Suppress which remained pending until this Opinion was issued. Thus, only thirteen days of defendant's Speedy Trial time had passed. After October 26, 1999, all of the delays have resulted from other motions plus the mental competency examination. Most of the delays in this case are attributable to the defendant's own "pattern of disruptive conduct," and there has been no evidence indicating that the government has delayed bringing this case to trial to gain a "tactical advantage," as suggested by the defendant. The defendant has been in no way prejudiced by the delays occurring in this case. The trial in this case was scheduled to commence on May 15, 2000, well before the Speedy Trial date, accordingly there have been no violations of Speedy Trial Act. Defendant's Motion to Dismiss is therefore **DENIED**.

## II. *Motion to Suppress Statements*

Defendant alleges that the statements made on March 19, 1999, after he was read his *Miranda* rights, are now inadmissible and asserts, "Defendant does not indicate that he understood his rights, nor that he would willingly waive those rights." Defendant's *Miranda* rights were read to him from a pre-printed card. Further, defendant admits that he was properly read his rights in accordance with *Miranda*. In response, defendant stated to the detectives, "Those ain't rights, but I understand them," and then proceeded to answer questions asked by the detectives. When asked if he wanted to talk, defendant responded, "Isn't anything to talk about, is it?" During the interview, Detective Cruz did inform the defendant that he had the

discretion at that point whether or not to bring charges against the defendant. He also stated to the defendant that he could not "make promises" on how. defendant's cooperation would assist him in the situation. The detectives also informed the defendant that they were not interviewing him in an attempt to get a "confession" out of him. The defendant was given water to drink when he requested it, and he rejected any medical attention even though it was offered. At the May 1, 2000 hearing, Detective Cruz testified that on March 19, 1999, the defendant was in control of his wits while being interviewed and that his will was not overborne by the circumstances of his arrest.

■ The Fourth Circuit in *United States v. Frankson,* 83 F.3d 79 (4th Cir. 1996), held that "*Miranda* and its progeny simply do not require that police officers provide ' highly particularized warnings. Such a requirement would pose an onerous burden on police officers to accurately list all circumstances in which *Miranda* rights might apply." *Id.* at 82. All that is required is for the police officers to "convey the general rights enumerated in *Miranda,*" *id.,* as was done in this case. As defendant was properly informed of his *Miranda* rights, the admissibility of defendant's statements turns on whether the statements were voluntary. *See United States v. Dickerson,* 166 F.3d 667, 684 (4th Cir.1999) (holding that the admissibility of confessions in federal court is governed by 18 U.S.C. § 3501 rather than *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), *cert. granted,* — U.S. ——, 120 S.Ct. 578, 145 L.Ed.2d 481, 68 U.S.L.W. 3361 (1999).

A statement will be considered "involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton,* 112 F.3d 777, 782–83 (4th Cir. 1997). For a statement to be deemed involuntary under the Due Process Clause, it must be obtained by 1) threats or violence; 2) direct or implied promises; or 3) the exertion of improper influence. *Id.* The voluntariness of a statement is to be determined from the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *See United States v. Wertz,* 625 F.2d 1128, 1134 (4th Cir.1980). The test of voluntariness is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is not, however, "equated with the absolute absence of intimidation," as under this test, virtually no statement would be characterized as voluntary. *Wertz,* 625 F.2d at 1134.

Defendant argues that the detectives' statements regarding the impact of his cooperation or lack thereof on his situation as well as the detectives' reference to their discretion in bringing charges against the defendant were designed to intimidate the defendant or extract statements from him as a result of promises of leniency. Truthful statements about the defendant's predicament are not the type of "coercion" capable of rendering a statement involuntary. *See United States v. Pelton,* 835 F.2d 1067, 1073 (4th Cir.1987). The Supreme Court has noted that no statements would be characterized as voluntary under such a standard, for "very few people give incriminating statements in the absence of official action of some kind." *Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041. Further, detectives may properly initiate discussions on the impact of defendant's cooperation, and may indicate that they will make this cooperation known. *See United States v. Shears,* 762 F.2d 397, 401–02 (4th Cir.1985). "General encouragement to cooperate is far different from specific promises of leniency." *Pelton,* 835 F.2d at 1073. The detectives in this case consistently refused to give any guarantees and specifically informed the defendant that they were "not gonna make promises." Govt.Exh. 5. These facts do not support a

finding that defendant's will was overborne or that his capacity for self-determination was critically impaired. Defendant's statements were made voluntarily and are thus admissible as a matter of law. Accordingly, defendant's Motion to Suppress statements given on March 19, 1999 is **DENIED.**

### III. Motion to Suppress Evidence

▉ Defendant asserts that the VBPD did not knock and announce their presence prior to entry as required by *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). In *Wilson* and *Richards v. Wisconsin*, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), the Supreme Court held that "no knock" entries do not run afoul of the Fourth Amendment where there is reasonable suspicion with a particularized basis to believe knocking and announcing would be "futile" or "dangerous" or allow the destruction of evidence. *See id.* at 394, 117 S.Ct. 1416; *Wilson*, 514 U.S. at 936–37, 115 S.Ct. 1914. "This standard—as opposed to a probable—cause requirement—strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by the no-knock entries." *Richards*, 520 U.S. at 394, 117 S.Ct. 1416. Further, there is no requirement that a magistrate rule on the use of a "no knock" entry at the time of the issuance of a search warrant. In *Richards*, the Supreme Court upheld as "reasonable under the circumstances" the officers' decision "as of the time [of entry]" to make a "no knock" entry notwithstanding a magistrate's earlier refusal to allow such an entry in the search warrant. *See id.* at 395–96, 117 S.Ct. 1416.

Defendant attempts to distinguish this case from *United States v. Grogins*, 163 F.3d 795 (4th Cir.1998), in which the Fourth Circuit reversed a suppression of evidence by this Court on the basis that this Court followed a probable cause standard in reviewing the officers' decision in that case to make an unannounced entry, rather than the "reasonable suspicion" standard set by the Supreme Court in *Richards*. In *Grogins*, the Fourth Circuit held that "[f]or a no-knock search to pass constitutional muster, officers must have some particularized basis for their suspicion." *Id.* at 797. The Fourth Circuit held that the officers in *Grogins* did have reasonable suspicion, "[g]iven the informant's tip and the independent knowledge of the police, the officers had an eminently reasonable foundation for their suspicion that Wooten would be at the stash house the evening of the search. And because the police had an abundance of evidence that Wooten was a violent drug dealer, they reasonably suspected that knocking and announcing their presence would be dangerous." *Id.* at 798. The police in *Grogins* were also aware of "Wooten's history of gun-related violence and maiming." *Id.* at 798–99.

The Fourth Circuit recognized the dangers inherent in concluding that the police in *Grogins* lacked a reasonable suspicion, noting that this would be "an invitation to second-guess police decisions by reviewing all of the evidence in the light least favorable to the officers on the street." *Id.* at 798. The appropriate test is whether the officers "at the time of the search" had a reasonable suspicion of danger. *See id.* The Fourth Circuit concluded that the "officers here need not have knocked and 'take[n] the risk that the answer might be a bullet.'" *Id.* at 799.

The decision of the VBPD at the time of the search in this case, like the officers in *Grogins*, was based on reasonable suspicion that knocking and announcing their presence would be dangerous. The VPBD's decision to utilize a no-knock entry was based on the knowledge 1) that firearms were present in the residence where defendant was conducting a marijuana grow operation and distributing drugs and 2) that the defendant had a criminal history including arrests for as-

saulting a police officer, resisting arrest, firearms violations, and drug offenses. Accordingly, defendant's Motion to Suppress the evidence seized as a result of the execution of the search warrant on March 19, 1999 is **DENIED.**

### CONCLUSION

For the reasons stated above, defendant's Motion to Dismiss and Motions to Suppress with regard to the statements given and evidence seized are **DENIED.**

The Clerk is **REQUESTED** to send copies of this Order and Opinion to the Assistant United States Attorney and to counsel for the defendant.

It is so **ORDERED.**