**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                           No. 97-4931

GEORGE ALAN GROGINS,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Rebecca B. Smith, District Judge.
(CR-97-59)

Argued: September 24, 1998

Decided: November 16, 1998

Before WILKINSON, Chief Judge, and WILKINS and
NIEMEYER, Circuit Judges.

_____

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Wilkins and Judge Niemeyer
joined.

_____

**COUNSEL**

**ARGUED:** Timothy Richard Murphy, Special Assistant United
States Attorney, Norfolk, Virginia, for Appellant. Timothy Gerard
Clancy, CUMMING, HATCHETT & JORDAN, Hampton, Virginia,
for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney,
Robert E. Bradenham II, Assistant United States Attorney, Norfolk,

Virginia, for Appellant. Lisa A. Mallory, CUMMING, HATCHETT & JORDAN, Hampton, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

George Alan Grogins was charged with possession with intent to distribute heroin and cocaine in violation of 21 U.S.C. § 841(a)(1). The district court granted Grogins' motion to suppress drug evidence seized at his home on the grounds that the police officers unreasonably failed to knock and announce their presence in violation of Wilson v. Arkansas, 514 U.S. 927 (1995). The government appeals, arguing that the officers had a reasonable suspicion that knocking would have placed them in personal danger. We agree. Officers need not gamble with their safety when they execute a search warrant at a drug stash house. We therefore reverse the suppression ruling of the district court.

I.

The search in this case grew out of a police investigation of Alonzo "Cutt" Wooten's activities in Newport News, Virginia. The Newport News police received information that Wooten was a drug dealer who supplied his downtown retail location from a residential "stash house" in which he stored cocaine, heroin, and related paraphernalia. Grogins lived in this stash house.

Wooten was not unfamiliar to the police. Detective Dawes testified that he had known Wooten since 1980 and that Wooten had a notorious history of drug-related and violent activities. Wooten had been involved in shoot-outs and had managed a drug-selling operation. In the 1980s, he spent time in jail. After he was released, Wooten continued selling drugs. In the mid-1990s, he intimidated several people who owed him money by shooting into their dwellings. In addition, Wooten trained his associates in techniques of evidence destruction. He instructed his confederates on the street to discard drug evidence upon the first sight of police. He told other accomplices to keep a

2

bucket filled with water and lye nearby; if police officers arrived on the scene, Wooten told them to throw the drugs into the bucket because officers would not put their hands in the lye. Wooten also had stated that he was not going back to jail and that he would do whatever was necessary to avoid it.

Dawes learned from a reliable informant that Wooten would visit Grogins' house daily to retrieve drugs that were stored there. Wooten took steps to avoid being connected with the stash house. He frequently drove the vehicles of others and occasionally walked to the stash house. On September 6, 1997, the informant told Dawes that Wooten had visited the house earlier in the day in a gray Fiero. That informant also stated that Wooten would visit the house that evening. Based upon the information that the home was a stash house, Dawes obtained a search warrant for Grogins' residence.

As Dawes and his fellow officers prepared to conduct the search, surveillance of Grogins' home revealed that a yellow car was parked outside. The police believed the car belonged to Wooten's stepfather. They could not, however, locate Wooten himself. They attempted to locate him that evening at his own residence, but the lights to his house were dark and no vehicles could be spotted in the driveway.

The police arrived to search Grogins' house at approximately 11:20 p.m. They found the house lit, but could not see anyone inside. Dawes decided to execute the warrant without knocking and announcing the presence of police. A search of the house turned up seven ounces of cocaine, ten ounces of heroin, equipment and supplies to package the drugs, and a .25 caliber semi-automatic handgun. Grogins was the only person in the house. He was charged with two counts of possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1).

Grogins moved to suppress the evidence seized during the search, arguing that the police unreasonably bypassed the normal practice of knocking and announcing their presence. The district court agreed and suppressed the evidence. The government appeals pursuant to 18 U.S.C. § 3731.

II.

"[T]he Fourth Amendment incorporates the commonlaw requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." Richards v. Wisconsin, 117 S. Ct. 1416, 1418 (1997). This knock-and-announce requirement may be excused by exigent circumstances. See, e.g., id.; United States v. Kennedy, 32 F.3d 876, 882 (4th Cir. 1994). "In order to justify a `no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards, 117 S. Ct. at 1421; accord United States v. Ramirez, 118 S. Ct. 992, 995 (1998). "Whether exigent circumstances existed at the time of the entry, and whether the degree of the exigency was sufficient to justify the extent of the noncompliance, is determined by an analysis of the facts of each case." Kennedy , 32 F.3d at 882. For a no-knock search to pass constitutional muster, officers must have some particularized basis for their suspicion. See Richards, 117 S. Ct. at 1421; United States v. Lalor, 996 F.2d 1578, 1584 (4th Cir. 1993). Appellate review of whether this basis amounts to reasonable suspicion is de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996).

The government contends that the district court committed legal error by requiring police officers to have a "reasonable belief" -- not simply a reasonable suspicion -- that exigent circumstances existed. It argues that the legal test applied by the district court approached the more rigorous requirement of probable cause. See, e.g., id. at 696 (probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that" exigent circumstances were present (emphasis added)). The use of the term "belief" may not be dispositive on this issue. See Maryland v. Buie, 494 U.S. 325 (1990) (using "reasonable belief" to characterize the reasonable suspicion standard); Michigan v. Long, 463 U.S. 1032 (1983) (same). In reviewing the record, however, we find that the district court's scrutiny approximated, if it did not exceed, the probable cause standard. The Supreme Court has expressly rejected this standard with respect to forgoing knocking and announcing. Richards, 117 S. Ct. at 1421-22. Instead, the Court has required that an officer

4

have a reasonable suspicion -- a "showing [that] is not high." Id. at 1422.

III.

A.

We thus proceed to apply the appropriate standard to the search. Grogins does not contest that the police reasonably suspected that Wooten posed a danger, but he insists that the evidence must still be suppressed because the police did not reasonably suspect that Wooten would be at the stash house that evening. He notes that the informant told the police both that Wooten visits the stash house daily and that Wooten had already been to the house on the day of the search. Grogins contends that the only reasonable inference is that Wooten had no further business at the stash house and thus that he would not be there that evening. Grogins bolsters this argument by noting that police surveillance never spotted Wooten or the gray Fiero near the stash house that night. And he deduces from the darkness of Wooten's own residence and the hour of night (11:20 p.m.) that Wooten had retired for the evening. Thus, Grogins submits that the police lacked a reasonable suspicion that Wooten would be present at Grogins' home.

We disagree. Grogins' contentions ignore the reasonable basis the police did have for their suspicion. The officers knew Wooten frequented Grogins' home and used it as a stash house for his illicit wares. A reliable informant -- one who had repeatedly provided details of Wooten's behavior that the police were able to confirm -- told the police that Wooten would visit Grogins' house that night. The police could not locate Wooten elsewhere. After checking his home and finding it dark, the police could not rule out the real possibility that Wooten would be at the stash house instead of at home. Despite the late hour, this was not an unreasonable conclusion -- the drug business often flourishes after dark. A police officer is entitled to "view[ ] the facts through the lens of his police experience and expertise." Ornelas, 517 U.S. at 699. Given the informant's tip and the independent knowledge of the police, the officers had an eminently reasonable foundation for their suspicion that Wooten would be at the stash house the evening of the search. And because the police had an

5

abundance of evidence that Wooten was a violent drug dealer, they reasonably suspected that knocking and announcing their presence would be dangerous.

An argument that the police lacked a reasonable suspicion on this evidence is an invitation to second-guess police decisions by reviewing all of the evidence in the light least favorable to the officers on the street. We will not make police work an even more hazardous enterprise by putting difficult decisions to such a test. Based on facts known to the officer at the time of the search, a mere suspicion of danger -- if reasonable -- will excuse the police from knocking and announcing their presence. Here, the police had a more than adequate basis to forgo knocking. The district court erred by suppressing the fruits of the search.

B.

We also take exception to Grogins' contention that the legality of the search hinged entirely on the likelihood of Wooten's presence at the precise moment the officers executed the search warrant. Although the police must have a particularized basis for their suspicion in every case, Lalor, 996 F.2d at 1584, and blanket exceptions to the knock and announce rule are impermissible, Richards, 117 S. Ct. at 1420-22, police officers need not ignore the insights gleaned from their experience on the beat. Such general insights -- background facts -- when combined with particularized facts can form the basis for reasonable suspicion. "The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. . . . [A] police officer may draw inferences based on his own experience in deciding whether probable cause exists." Ornelas, 517 U.S. at 699-700. Thus the Supreme Court in Richards found the reasonable suspicion standard met by just two particularized facts: the occupant of the premises to be searched apparently recognized that undercover policemen were at his door and that the officers were searching for "easily disposable" drugs. 117 S. Ct. at 1422. To these facts, the officers were able to add general premises from their experience, such as the common-sense presumption that drug dealers will dispose of evidence if given the opportunity.

Here, the police had a particularized basis to reasonably suspect that knocking and announcing would be met with violent resistance.

6

The police had reliable information that the dwelling to be searched was a stash house, which continuously served as a drug distribution center. The police learned that the house was occupied by Grogins, who stored drugs for Wooten. The police were aware that Wooten daily frequented the house. They were also well apprised of Wooten's history of gun-related violence and maiming, including engaging in shoot-outs and firing into the houses of those who owed him money. Additionally, they knew Wooten trained his minions in criminal techniques. From this, the police could reasonably infer that Wooten may have transferred his predilection for violence to others, including Grogins, who helped run Wooten's operation.

Added to these particularized facts is the background fact that the connection between illegal drug operations and guns in our society is a tight one. See Kennedy, 32 F.3d at 882-83 ("[G]uns are common in drug transactions . . . ."); United States v. White, 875 F.2d 427, 433 (4th Cir. 1989) ("[I]t is not unreasonable to recognize that weapons have become tools of the trade in illegal narcotics operations." (internal quotation marks omitted)); United States v. Bonner, 874 F.2d 822, 827 (D.C. Cir. 1989) (The "entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers."). Courts have long acknowledged that the nature of criminal activity can strongly inform an officer's suspicion that a target is armed. See Terry v. Ohio, 392 U.S. 1, 28 (1968) (noting that an officer, reasonably suspecting that a man was about to perform a daylight robbery, "would have been warranted in believing [that man] was armed and thus presented a threat to the officer's safety"). Thus, the police could reasonably suspect from the continuous use of the home as a drug stash house that guns would be present and that knocking and announcing their presence would be dangerous.*

_____

*Although concerns for the personal safety of the officers are paramount, Richards makes plain the search here could likewise be justified on the grounds that the officers had a reasonable basis to suspect that evidence would be destroyed. Detective Dawes testified that he knew that Wooten instructed his underlings how to avoid being caught with narcotics evidence. Of particular importance here is Wooten's advice to his associates to dispose of drugs in a bucket of lye when the police arrive. Dawes could have reasonably suspected that Grogins would have done so if the police provided notice of their presence.

7

IV.

The officers here need not have knocked and "take[n] the risk that the answer might be a bullet." Id. at 33 (Harlan, J., concurring). Accordingly, the district court's suppression order is reversed and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED

8