**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TAMETTA BELLOTTE, Individually;
E. B.; C. B., by and through their
next friend and mother, Tametta
Bellotte,

*Plaintiffs-Appellees,*

v.

TRACY L. EDWARDS, Detective; P.
G. SMITH, DEPUTY; KEITH
SIGULINSKY, Corporal, Ranson
Police Department, formerly
UNKNOWN DEFENDANT ONE; ADAM
LETTS, Corporal, Charles Town
Police Department, formerly
UNKNOWN DEFENDANT TWO;
ROBERT SELL, Corporal, Jefferson
County Sheriff's Department,
formerly UNKNOWN DEFENDANT
THREE; KEVIN BOYCE, Corporal,
Jefferson County Sheriff's
Department, formerly UNKNOWN
DEFENDANT FOUR; JAMES TENNANT,
Deputy, Jefferson County Sheriff's
Department, formerly UNKNOWN
DEFENDANT FIVE; BRANDON
HAYNES, Deputy, Jefferson County
Sheriff's Department, formerly
UNKNOWN DEFENDANT SIX; SAM
SMITH, Patrolman, Charles Town
Police Department, formerly
UNKNOWN DEFENDANT SEVEN;

No. 10-1115

ANTHONY MANCINE, Patrolman,
Charles Town Police Department,
formerly UNKNOWN DEFENDANT
EIGHT; PATRICK NORRIS, Patrolman,
Ranson Police Department,

*Defendants-Appellants,*

and

WAL-MART STORES EAST, L.P.,

*Defendant,*

v.

SAMUEL JOSEPH BELLOTTE,

*Third Party Defendant.*

TAMETTA BELLOTTE, Individually;
E. B.; C. B., by and through their
next friend and mother, Tametta
Bellotte,

*Plaintiffs-Appellants,*

v.

TRACY L. EDWARDS, Detective; P.
G. SMITH, Deputy; KEITH
SIGULINSKY, Corporal, Ranson
Police Department, formerly
UNKNOWN DEFENDANT ONE; ADAM
LETTS, Corporal, Charles Town
Police Department, formerly
UNKNOWN DEFENDANT TWO;

No. 10-1123

ROBERT SELL, Corporal, Jefferson County Sheriff's Department, formerly UNKNOWN DEFENDANT THREE; KEVIN BOYCE, Corporal, Jefferson County Sheriff's Department, formerly UNKNOWN DEFENDANT FOUR; JAMES TENNANT, Deputy, Jefferson County Sheriff's Department, formerly UNKNOWN DEFENDANT FIVE; BRANDON HAYNES, Deputy, Jefferson County Sheriff's Department, formerly UNKNOWN DEFENDANT SIX; SAM SMITH, Patrolman, Charles Town Police Department, formerly UNKNOWN DEFENDANT SEVEN; ANTHONY MANCINE, Patrolman, Charles Town Police Department, formerly UNKNOWN DEFENDANT EIGHT; PATRICK NORRIS, Patrolman, Ranson Police Department,

*Defendants-Appellees,*

and

WAL-MART STORES EAST, L.P.,

*Defendant,*

v.

SAMUEL JOSEPH BELLOTTE,

*Third Party Defendant.*

Appeals from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
John Preston Bailey, Chief District Judge.
(3:08-cv-00094-JPB)

Argued: October 27, 2010

Decided: January 11, 2011

Before WILKINSON, GREGORY, and WYNN,
Circuit Judges.

_____

Affirmed in part, reversed in part, dismissed in part, and
remanded by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Gregory joined. Judge Wynn wrote
a separate opinion dissenting in part.

_____

**COUNSEL**

Jason Patrick Foster, STEPTOE & JOHNSON, LLP, Martins-
burg, West Virginia, for Appellants/Cross-Appellees. Thomas
E. Carroll, CARROLL & TURNER, PSC, Monticello, Ken-
tucky, for Appellees/Cross-Appellants.

_____

**OPINION**

WILKINSON, Circuit Judge:

   In this case, police officers executed a late-night, no-knock
entry into a family's home. Though the officers claim that
exigent circumstances justified their conduct, we agree with
the district court that the remarkably scanty rationale offered
for the no-knock invasion makes an award of qualified immu-

nity inappropriate. With respect to the denial of qualified immunity on plaintiffs' other claims, we affirm in part and reverse in part, and dismiss the cross-appeal for want of jurisdiction.

I.

On May 31, 2007, Sam Bellotte printed some photographs from a memory card at a self-service station in a Winchester, Virginia Wal-Mart. When he went to pay for the prints, a clerk insisted on inspecting the photos. Mr. Bellotte admitted that some contained nudity and surrendered them, then made other purchases and left the store.

The Wal-Mart employees charged with discarding the photos noticed one depicting male genitalia seemingly next to a child's face. Concerned that the photograph was child pornography, the employees notified the Frederick County police. An investigation of the surveillance camera footage and credit card receipts showed that Mr. Bellotte, a resident of Jefferson County, West Virginia, had printed the photo in question. A Frederick County police officer placed the photo in a file container and notified the Jefferson County Sheriff's Department, which then took responsibility for the investigation. After reviewing the file, verifying Mr. Bellotte's address, and learning that both Mr. and Mrs. Bellotte held concealed carry permits, Detective Tracy Edwards sought a search warrant for the Bellotte residence. Around 9:00 that evening, the magistrate reviewed the application and signed the warrant.

In order to execute the warrant, Detective Edwards sought and received approval from the ranking Jefferson County law enforcement officer for the assistance of the Jefferson County Special Operations Team ("SORT Team"). The SORT Team leaders decided that their involvement was justified due to the possibility of a violent reaction from Mr. Bellotte and the concealed carry permits held by both Mr. and Mrs. Bellotte. After

the three SORT squads were assembled and briefed, they arrived at the Bellotte residence around 10:15 p.m.

The three squads took positions around the house, wearing tactical vests and helmets and armed with flashlight-equipped .45 caliber Sig Sauer pistols and "hooligan" pry bars for a possible forced entry. Then, the Bellottes claim, the SORT squads opened the unlocked front and rear doors without knocking or announcing their presence. They immediately executed a dynamic entry—a technique that the SORT Team had recently been trained in—by which all squads simultaneously rushed into the home from multiple entry points. After the SORT squads were inside the house, they repeatedly identified themselves as law enforcement officers executing a search warrant.

The first member of the family to encounter the SORT Team was E.B., the Bellottes' teenage son. When the officers found him upstairs walking out of his bedroom and talking on a cell phone, they subdued and handcuffed him. E.B. asserts that the officers also poked a gun at the back of his head. In another bedroom, the team found C.B., the Bellottes' young daughter, and led her downstairs unhandcuffed.

When the SORT Team came to the parents' bedroom, Tametta Bellotte raced out of bed and ran screaming toward the closet. When she reached for a gun bag, the officers forced her to the ground and handcuffed her. Later, when the house was secured, the SORT Team allowed Mrs. Bellotte to get fully dressed under the supervision of a female officer. The search of the Bellotte residence concluded shortly before midnight.

Mr. Bellotte, it turns out, had spent that night in his hunting cabin in Hampshire County, West Virginia. The next morning, when his wife told him what happened, he went to see Detective Edwards at the Jefferson County Sheriff's Office. He gave a recorded statement and later produced a passport

and birth certificate showing that the female in the photo was not a child, but in fact a 35-year-old woman who lived in the Philippines. Thus Mr. Bellotte did not in fact possess any child pornography, and no charges were ever filed against him.

Mrs. Bellotte and her children brought several causes of action against Detective Edwards and the officers involved in the search under 42 U.S.C. § 1983 and state law. On December 28, 2009, the district court granted in part and denied in part defendants' motion for summary judgment. The court dismissed plaintiffs' claims inasmuch as they alleged that the search warrant was invalid and that certain aspects of the execution of the warrant were unreasonable. The court did find, however, that the defendants were not entitled to qualified immunity from the plaintiffs' Fourth Amendment claims regarding the no-knock entry and excessive use of weapons. Finally, the court allowed the plaintiffs' state-law claim for intentional infliction of emotional distress to proceed as well. The officers appealed the partial denial of qualified immunity, and the Bellottes cross-appealed the partial grant of summary judgment on their search warrant and warrant execution claims.

## II.

The district court granted summary judgment to the officers on the Bellottes' claims that the hour of the evening chosen for the search and the decision to have the SORT Team present during the search were unreasonable, and those claims are not before us on this appeal. Instead, we address here the narrow question whether the officers are entitled to qualified immunity with respect to the Bellottes' no-knock entry claim. The officers offer two reasons. They first argue that the no-knock entry did not violate the Fourth Amendment because it was justified under the circumstances. The officers also assert that the entry did "not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). But the thin justification offered here renders this particular entry a violation of clearly established Fourth Amendment law governing the obligation to knock and announce.

A.

The knock-and-announce requirement has long been a fixture in law. *Gould v. Davis*, 165 F.3d 265, 270 (4th Cir. 1998). Before forcibly entering a residence, police officers "must knock on the door and announce their identity and purpose." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997). This requirement serves the valuable ends of "(1) protecting the safety of occupants of a dwelling and the police by reducing violence; (2) preventing the destruction of property; and (3) protecting the privacy of occupants." *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996).

Though the "knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry," *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995), no-knock entries may still be reasonable by virtue of exigent circumstances, *see United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994). "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards*, 520 U.S. at 394. The Supreme Court has admonished that "it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." *Id.* We have thus required a particularized basis for any suspicion that would justify a no-knock entry. *See United States v. Dunnock*, 295 F.3d 431, 434 (4th Cir. 2002).

## B.

The officers first argue they had a reasonable suspicion that knocking and announcing their presence would jeopardize their own safety.[1] In particular, they contend that Mr. Bellotte, due to his suspected possession or production of child pornography, "could react unpredictably and possibly violently" when faced with the prospect of arrest and prosecution. *Brief of Appellants* at 24. The embarrassment that citizens face in being linked to child pornography, so the theory goes, leads them to violence when confronted with an investigator's presence.

Such speculation hardly establishes the level of justification needed to authorize a no-knock entry. Production or possession of child pornography is patently unlawful and utterly deplorable, but to condemn it is not to say that it automatically constitutes a violent crime. Assuming, purely for the sake of argument, that the photograph Mr. Bellotte left behind was child pornography, one could not reasonably discern a propensity to violence toward police from that picture alone. Possession of this single photograph, without more, simply does not provide a particularized basis for believing that there was danger to police executing a warrant. Conjecture to the contrary under these circumstances was unreasonable.

Nor was there any indication that the Bellottes had any tendency to violence in general. There is no record that either of the Bellottes had ever been convicted of a crime, or that either of them had ever had a run-in with the law. To the contrary, the officers admit that holding concealed carry permits showed the Bellottes to be citizens in good standing who passed a background check. Then as now, the officers do not point to even a single incident that would call into question

---

[1]The district court noted the officers' concession "that Detective Edwards did not state any particularized basis for her concern that evidence may be destroyed," and we accordingly do not take up the question.

their fitness to carry a concealed weapon or to retain the clearly established constitutional protection of the knock-and-announce requirement.

*United States v. Grogins*, 163 F.3d 795 (4th Cir. 1998), illustrates one paradigmatic no-knock entry and shows by contrast how weak the case before us is. In *Grogins*, officers executing a search warrant at a drug stash house declined to knock and announce for fear of their own safety. The subject of the investigation had a violent history of shoot-outs, managing drug operations, and intimidating people by firing weapons into their homes. He even made a chilling declaration "that he was not going back to jail and that he would do whatever was necessary to avoid it." *Id.* at 796. Whereas the officers in *Grogins* had a truly reasonable suspicion that their own lives would be in danger if they announced their presence to such a vicious individual, the officers here can point to not even one of these particularized indicia of risk.

In *United States v. Singleton*, 441 F.3d 290 (4th Cir. 2006), police argued that the knock-and-announce requirement should be excused not only because of "generalizations about the inherent violence of drug dealers," but also because of the defendant's multiple previous firearms offense arrests, a previous arrest for second-degree murder, and his location in "a known open air drug market." *Id.* at 293. While that support did not unambiguously establish "'a *particularized* basis to reasonably suspect that knocking and announcing would be met with violent resistance,'" *id.* (quoting *Grogins*, 163 F.3d at 798) (emphasis in original), we found that the no-knock entry did not violate the Fourth Amendment because the officers had "reasonably relied in good faith upon a properly obtained search warrant that specifically authorized a no-knock search," *id.* at 294.

In this case, no warrant authorized a no-knock entry. This circuit has approved of such warrants in appropriate circumstances, *see Singleton*, 441 F.3d at 294, and these very offi-

cers testified to their previous experience with no-knock warrants. The officers do not contend, and indeed nothing in the record shows, that they discovered any new information after securing the warrant that would have been supportive of a no-knock entry. Of course, the absence of a no-knock warrant "should not be interpreted to remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed." *Richards*, 520 U.S. at 396 n.7. But where, as here, the officers faced no barrier at all to seeking no-knock authorization at the time they obtained a warrant, "a strong preference for warrants" leads us to view their choice not to seek no-knock authorization with some skepticism. *United States v. Leon*, 468 U.S. 897, 914 (1984).

To permit a no-knock entry on facts this paltry would be to regularize the practice. Our cases allow officers the latitude to effect dynamic entries when their safety is at stake, but the Fourth Amendment does not regard as reasonable an entry with echoes, however faint, of the totalitarian state. The officers who burst into the Bellotte home point to no signpost of danger, nor to any criminal history, nor indeed to any factor that "distinguishes this particular search from many others that police conduct on a daily basis." *Singleton*, 441 F.3d at 294. What prompted their entry was the possession of a single photograph suggestive more of unlawful lurid propensities than of violent ones. Officers are, of course, entitled to interpret "facts through the lens of [their] police experience and expertise." *Grogins*, 163 F.3d at 798 (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). But the entry here seems less grounded in experience than in speculation, which the district court rightly found to be "insufficiently particularized to excuse the knock and announce requirement," and inadequate to justify a grant of qualified immunity.

## C.

The officers next contend that a no-knock entry was proper not only for their own safety, but for that of Mr. Bellotte as

well. As they read it, "[t]he available scholarly and scientific literature pertaining to sexual offenders underscores that they are at great risk for suicide at any number of phases of the arrest and prosecutorial process." *Brief of Appellants* at 25-26. From this, we are to conclude that knocking and announcing posed a threat to Mr. Bellotte. We find this argument unpersuasive.

For starters, the claim is speculative. The officers' own testimony demonstrates that there was no reasonable, particularized suspicion that Mr. Bellotte was a danger to himself, but instead uncertainty about what child pornographers in general would do upon arrest: "Because you don't know how or what the mental status of somebody [is] that you're doing a warrant for child pornography, you don't know how they're going to react." *Brief of Appellants* at 24. But the constitutional standard of reasonableness demands a particularized basis before dispensing with the requirement to knock and announce—a particularized basis not presented by these facts.

The officers attempt to shore up the argument by citing to an empirical study, Colin Pritchard and Elizabeth King's "Differential Suicide Rates in Typologies of Child Sex Offenders in a 6-year Consecutive Cohort of Male Suicides," 9 *Archives of Suicide Research* 35 (2005), that allegedly supports their assessment of Mr. Bellotte's suicide risk. We are reluctant at the outset to credit this ex post rationalization, for the record provides no indication that the officers were aware of this study at the time of the entry. *See Ker v. California*, 374 U.S. 23, 41 n.12 (1963) ("It goes without saying that in determining the lawfulness of entry . . . we may concern ourselves only with what the officers had reason to believe *at the time of their entry*."). More importantly, the authors of the study wisely caution against drawing a particularized assessment of suicide risk for any one person, for "this epidemiological approach can say little about an individual and can only yield results that are indicative, rather than definitive, of general trends." Pritchard & King, *supra*, at 40. Caution is further

appropriate because the study draws on a sample that is both small and foreign—two counties in southern England. *Id.* at 37.

Even read in the light most favorable to the officers, the study offers but scant support. It found that the annual suicide rate for the relevant set of convicted child sex offenders was 2.7%, hardly enough for a reasonable inference of suicide risk in someone not even convicted of the crime. *Id.* at 39. The authors candidly admit that "the numbers of suicides as sequel to child sexual offender [convictions] were small." *Id.* More-over, it remains unclear how many, if any, of those suicides occurred at the time of arrest, for the study deals only with those that "occurred around the time of the trial or the disclosure of their offences." *Id.* To leap from this narrow study in southern England to a particularized basis that Mr. Bellotte presented an imminent suicide risk requires an extrapolation that flirts with absurdity.

Finally, cases addressing the justifications for no-knock entries speak primarily in terms of officer safety. *See, e.g.*, *Singleton*, 441 F.3d at 293 ("[E]xigent circumstances—like a threat of physical violence to officers—may allow officers to conduct a no-knock entry.") (internal quotation omitted); *Gould*, 165 F.3d at 274 ("Without question, the failure to knock and announce prior to entering a home can be justified by a fear for officer safety."); *United States v. Lalor*, 996 F.2d 1578, 1584 (4th Cir. 1993) ("Exigent circumstances include the possibility of destruction of evidence and danger to entering officers."); *see also Ker*, 374 U.S. at 40 (Exigent circumstances allow an exception to the knock-and-announce requirement when "the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose"). Certainly, we can imagine actual or threatened injuries to hostages or other third parties that might excuse the knock-and-announce requirement. A no-knock entry might even be appropriate in emergency circumstances to protect the suspect to be apprehended. But here, neither the

prospect of injury nor any other emergency gave the officers a plausible reason to neglect what the Constitution ordinarily demands. A professed concern for the suspect, grounded in little more than speculation about what a certain category of people might do under certain circumstances, fails to justify the ironic result of a violation of that very suspect's rights.

D.

Finally, the officers assert that there was a reasonable suspicion of danger to themselves and to the Bellottes because both Mr. and Mrs. Bellotte had concealed carry permits. According to the officers, homeowners with such permits "might have handguns readily accessible to them." *Brief of Appellants* at 26. The combination of ready access to handguns, combined with suspected involvement in child pornography, is said to create "the potential for a perfect storm of violence." *Id.* at 27.

It should go without saying that carrying a concealed weapon pursuant to a valid concealed carry permit is a lawful act. The officers admitted at oral argument, moreover, that "most people in West Virginia have guns." Most importantly, we have earlier rejected this contention: "If the officers are correct, then the knock and announcement requirement would never apply in the search of anyone's home who legally owned a firearm." *Gould*, 165 F.3d at 272; *accord United States v. Smith*, 386 F.3d 753, 760 (6th Cir. 2004); *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir. 1993). We recognized over a decade ago that "[t]his clearly was not and is not the law, and no reasonable officer could have believed it to be so." *Gould*, 165 F.3d at 272.

It is the officers' failure to offer a plausible and particularized basis for believing that someone in the Bellotte household would respond violently to a knock-and-announce entry that sinks their contention. "We think a reasonable officer would have known that guns do not fire themselves, and that

a justifiable fear for an officer's safety must include a belief, not simply that a gun may be located within a home, but that someone inside the home might be willing to use it." *Id.* While in some cases a no-knock entry may prevent violence, in others "an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006). That the sword is double-edged underscores the need for some particularized suspicion that a resident would resort to violence when police knock and announce their presence.

This is necessarily a narrow conclusion, for the result might be different under different facts. It might contribute to an exigency that supports a no-knock entry if the suspected crime were more closely connected with violence. *See Grogins*, 163 F.3d at 799. Likewise if it were unlawful to possess the weapon thought to be inside the home. *See United States v. Wardrick*, 350 F.3d 446, 452 (4th Cir. 2003). Or if the suspect had some history of criminal behavior. *See United States v. Ramirez*, 523 U.S. 65, 71 (1998). Or if he had actually threatened suicide. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009). We emphasize, however, that each factual situation must be examined in its totality, *see Illinois v. Gates*, 462 U.S. 213, 230-31 (1983), in order to make an exigency determination, and that we cannot script categorical rulings when future circumstances are unknown. Here the bare fact that the Bellottes had concealed weapon permits cannot justify this no-knock entry. We agree with the district court that a "contrary holding would issue a blanket rule permitting no-knock entries in all cases involving alleged child pornographers who happen to possess a weapon in their home." In a nation where suspicions of crime do not cancel every claim of liberty, this goes too far.

E.

Qualified immunity is meant to protect against liability for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d

295, 298 (4th Cir. 1992). This was not a bad guess. Not a single one of the officers' proffered rationales provides a reasonable, particularized basis to justify their conduct.[2] The officers contended at oral argument that a no-knock entry under these circumstances is "so infrequent, so uncommon that it's a gray area." To the contrary, we face here an unfortunate exception to the truism that "[t]he easiest cases don't even arise." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal quotation omitted). The absence of "a prior case directly on all fours" here speaks not to the unsettledness of the law, but to the brashness of the conduct. *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) (en banc). Because "a man of reasonable intelligence would not have believed that exigent circumstances existed in this situation," *Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003), we affirm the district court's holding that this no-knock entry violated the Bellottes' clearly established constitutional rights and does not warrant an award of qualified immunity.

---

[2]Our good colleague in dissent says the police believed there was a child victim in the home at the time of the search. There was no objective basis for that belief. Despite ample opportunity to do so, the officers advanced not one word on appeal for any belief that a child victim was in the house at the time of the search. The dissent points to nothing in the appellants' brief that even purports to suggest that Mr. Bellotte somehow kept a child victim in the house with his family, and we cannot adopt an argument too speculative for even the officers in this appeal to make. Instead, they press the view that mere possession of the photograph and the concealed weapon permits was sufficient to excuse the requirement to knock and announce. As a result, we fully agree with our dissenting colleague that the officers' asserted rationales were not reasonable and that "the officers' fear was not sufficiently supported to justify their dynamic no-knock entry into the Bellottes' home." *See* Dissenting Opinion at 26.

As to our differences on the point of qualified immunity, Supreme Court and circuit precedent clearly require a particularized reason to believe the Bellotte family would pose a danger, something less generic than the observations about concealed weapon permits and suicide risks raised at the most general levels by the officers in this appeal.

III.

The officers argue next that they are entitled to qualified immunity as to the Bellottes' claim that they used weapons in an unreasonable and excessive manner during the search of the house.

A.

As a species of excessive force claims, excessive-use-of-weapons allegations "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). As with no-knock entry analysis, application of the reasonableness standard to excessive-weapons claims "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396. Factors relevant to that analysis include "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397.

In *Taft v. Vines*, 83 F.3d 681, 684 (4th Cir. 1996) (en banc), this court specifically addressed the use of weapons in an excessive-force context. We adopted the dissenting panel opinion, which recognized the well-established rule that "[i]nvestigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop." *Taft v. Vines*, 70 F.3d 304, 320 (4th Cir. 1995) (Motz, J., dissenting) (quoting *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988)). In particular, "although 'approaching a suspect with drawn weapons [is an] extraordinary measure[ ], such [a] police procedure[ ] [has] been justified in this circuit as a reasonable means of neutral-

izing potential danger to police and innocent bystanders.'" *Id.*
(quoting *Taylor*, 857 F.2d at 214) (alterations in original).

B.

Mrs. Bellotte claims that the officers entered her home and
bedroom in dramatic fashion with guns unreasonably drawn.
The district court noted the sleepy state of the household just
before the entry, and the fright that ensued "as the officers ran
up the stairs toward their bedrooms, screaming, and pointing
guns . . . ."

Of course "[t]his is not an experience to be wished on any-
one." *Taft v. Vines*, 70 F.3d at 321 (Motz, J., dissenting). But
"[t]he risk of harm to both the police and the occupants is
minimized if the officers routinely exercise unquestioned
command of the situation," as they did here. *Michigan v. Sum-
mers*, 452 U.S. 692, 702-03 (1981). Mrs. Bellotte and her
children faced a situation quite like that of Mrs. Unus and her
daughter in *Unus v. Kane*, 565 F.3d 103 (4th Cir. 2009),
where federal agents executing a search warrant entered a res-
idence with firearms drawn. Applying the Virginia constitu-
tion's reasonableness requirement, we stated that "the officers
were reasonably entitled to believe that the drawing of weap-
ons was necessary in order to gain control of a fluid situation
and ensure the safety of all involved." *Id.* at 118. The officers
in Mrs. Bellotte's residence acted reasonably for the same rea-
son.

The risk to their safety was illustrated when Mrs. Bellotte
reacted in threatening, if understandable, fashion. When she
heard voices and footsteps in the house, she testified that she
"bolted out of [her] bed," "threw open the doors" of her closet,
and reached for a gun with the intention to shoot. At that
point, despite substantial reason to fear for their own safety,
the officers restrained Mrs. Bellotte not with deadly force but
by wrestling her to the ground. There was no allegation that
they touched her with a weapon or threatened to use a weapon

against her. Such a "split-second judgment" in the face of an immediate threat was a reasonable one. *Graham*, 490 U.S. at 397.

Thereafter, the officers continued to supervise the situation in reasonable fashion. They placed Mrs. Bellotte in handcuffs and covered her with a robe. They then took off the handcuffs when it was clear that there was no danger and when the children were secured and brought downstairs. The officers allowed Mrs. Bellotte to change clothes under the supervision of a female officer. That Mrs. Bellotte had to face such an experience was most unfortunate, but we cannot say that the officers used excessive force. They are entitled to qualified immunity as to Mrs. Bellotte's excessive-weapons claim, and the district court is accordingly reversed on that ground.

## C.

Plaintiffs also claim that the officers used excessive weapons against the Bellottes' daughter C.B. We have the deepest sympathy for a twelve-year-old "awakened to the sight of four or five men standing at the foot of her bed with flashing lights and guns pointed at her." *Brief of Appellees* at 39. But the officers had good reason to fear for their own safety upon entering an unsecured room. And there is no evidence that the officers who entered C.B.'s room kept their weapons drawn after they realized who she was. Once they realized that she did not "pose[ ] an immediate threat to the safety of the officers or others," *Graham*, 490 U.S. at 396, the officers used no force or weapons at all on C.B. *See also Unus*, 565 F.3d at 118 ("Indeed, the record reflects that the . . . defendants drew their weapons only long enough to ensure their safety and control of the situation."). The defendants are accordingly entitled to qualified immunity on that claim as well.

### D.

Unlike his mother and sister, E.B. alleges that he felt "boots in his back and a gun at the back of his head." *Brief of Appellees* at 38-39. The officers contest E.B.'s description of the encounter as a matter of fact, but recognize that such factual disputes are not immediately appealable and do not contend on appeal that the alleged conduct did not violate E.B.'s clearly established constitutional rights. *Brief of Appellants* at 2 n.3. Because we have jurisdiction over the denial of a claim for qualified immunity on summary judgment only "to the extent that the official maintains that the official's conduct did not violate clearly established law," *Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997) (en banc), we decline to review the factual dispute, with the result that E.B.'s claim shall go forward.[3]

### IV.

On cross-appeal, the Bellottes challenge the district court's grant of summary judgment to the officers with respect to the validity of the search warrant and the reasonableness of various aspects of the search. This cross-appeal falters, however, because there is no final order governing those issues from which to appeal. The partial grant of summary judgment to defendants was not a "final decision" for purposes of 28 U.S.C. § 1291, which "generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Dilly v. S.S. Kresge*, 606 F.2d 62, 63 (4th Cir. 1979) (quoting *Catlin v. United States*, 324 U.S. 229,

---

[3]In addition to their federal constitutional tort claims, the Bellottes brought state-law claims for intentional infliction of emotional distress. The district court denied the officers' request for immunity under West Virginia law, and the officers have not raised this issue on appeal. Thus, we will not address it here. *See United States v. Bowles*, 602 F.3d 581, 583 n.1 (4th Cir. 2010) (noting that arguments not raised in the appellant's opening brief are waived).

233 (1945)). Here, "[t]here is obviously something else for the district court to do but execute the judgment." *Id.*

The Bellottes nevertheless contend that because we have appellate jurisdiction over the denial of qualified immunity with respect to the no-knock entry and excessive-weapons claims, *see Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), we should choose to exercise pendent jurisdiction over the cross-appeal. Specifically, the Bellottes contend that "[i]t would be in the interest of judicial economy to resolve all of these issues on this appeal" because "[b]oth the Police Defendants' appeal and the Plaintiffs' cross-appeal deal with the constitutionality of the search of the Bellotte residence and whether the Police Defendants are entitled to qualified immunity." *Brief of Appellees* at 2.

This argument misses the mark. For starters, "[p]endent appellate jurisdiction is an exception of limited and narrow application driven by considerations of need, rather than of efficiency." *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). Even if this were otherwise a proper case for pendent jurisdiction, "[w]e are constrained by the language of the Supreme Court as well as our own precedent from recognizing efficiency considerations as a basis for the exercise of pendent appellate jurisdiction." *Id.*

Instead, we have recognized that such jurisdiction is proper only when an issue "is (1) inextricably intertwined with the decision of the lower court to deny qualified immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question." *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996) (citing *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995). The Bellottes have not argued that any of the issues on cross-appeal are "inextricably intertwined with," or "necessary to ensure meaningful review of," the denials of qualified immunity below such that pendent appellate jurisdiction is now appropriate. This omission is understandable. Our review of

the qualified immunity denials in no way requires an evalua-
tion of the claims that were dismissed on summary judgment
concerning the validity of the search warrant and the reason-
ableness of elements of the search other than the no-knock
entry and use of weapons. The appeal and the cross-appeal,
while sharing certain wholesale commonalities of fact (the
incidents leading up to and during the search of the Bellotte
residence) and law (the Fourth Amendment), nevertheless
present quite distinct factual and legal issues at the retail
level. *See Renn v. Garrison*, 100 F.3d 344, 352 (4th Cir.
1996) (denying pendent jurisdiction even when "many, or
even all, of the questions remaining in the case may well be
answered by [the] decision here"). We therefore dismiss the
cross-appeal for lack of jurisdiction.

V.

We recognize that police officers executing search warrants
must often make momentous decisions in minute amounts of
time. Qualified immunity provides critically important protec-
tion when a reasonable decision in the line of duty turns out
to be a bad guess. But when the officers failed to knock and
announce their presence under these particular circumstances,
they transgressed the boundaries identified by this circuit and
violated clearly established federal law. They may not now
seek the shelter of immunity for that claim. We affirm the
denial of qualified immunity with respect to the no-knock
entry and E.B.'s excessive-weapons claims and remand for
further proceedings. We also reverse the denial of qualified
immunity as to Mrs. Bellotte and C.B.'s excessive-weapons
claims, and dismiss the cross-appeal for want of jurisdiction.

*AFFIRMED IN PART, REVERSED IN PART,
DISMISSED IN PART, AND REMANDED*

WYNN, Circuit Judge, dissenting in part:

Qualified immunity gives law enforcement officers the
benefit of the doubt when preexisting law would not make

clear to a reasonable officer that his actions are unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Officers are "liable for transgressing bright lines" but not for making "bad guesses in gray areas." *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007) (quotation marks omitted).

In this case, police officers performed a no-knock entry into the home of someone suspected of sexual exploitation of a minor based on the officers' belief that a child victim and multiple firearms were in the home. I join the majority in concluding that the no-knock entry here was unlawful. As a result of this case, the law will be clearly established as to any similar entries in the future. I cannot conclude, however, that prior Supreme Court or Fourth Circuit case law *clearly established* that the no-knock entry was unlawful under the circumstances these officers confronted. On that basis, I must respectfully dissent.

When the officers executed the no-knock entry in 2007, it was clearly established that they "must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). It was also clearly established that a reasonable suspicion is "a minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

The reasonableness of the officers' asserted suspicion of danger is assessed based upon the information the officers possessed at the time they entered. *Ker v. California*, 374 U.S. 23, 41 n.12 (1963). Thus, it is critical to examine thoroughly what the officers knew at the time of entry to determine whether "pre-existing law [made] the unlawfulness [of the no-knock entry] apparent." *Hope*, 536 U.S. at 739; *see also DiMeglio v. Haines*, 45 F.3d 790, 804 (4th Cir. 1995) ("The contours of the right must be sufficiently clear that a reason-

able official would understand that what he is doing violates that right.").

Here, at the time of the no-knock entry, the officers knew that Mr. Bellotte printed and attempted to purchase pornographic pictures at a Wal-Mart on the morning of May 31, 2007. When asked by the cashier to inspect the photographs according to store policy, Mr. Bellotte resisted and admitted that some of the photographs contained nudity. After some escalation, Mr. Bellotte surrendered the photographs, adamant that they should be destroyed without inspection. While shredding the photographs, a Wal-Mart employee was alarmed by what appeared to be an adult's penis beside a young girl's face. Three other Wal-Mart employees, including two managers, also believed they saw a child in the photograph, so they decided to call police.

At least two Virginia police officers also believed a child was depicted in the photograph. According to the Virginia officers' police report, the photograph depicted "an approximately five to six year old white female being forced towards what appeared to be a male adult penis." Using Wal-Mart's camera surveillance and credit card records, the Virginia officers determined that the man who attempted to purchase the photographs was Mr. Bellotte.

In the later morning hours of May 31, the case was transferred to West Virginia law enforcement, and Detective Tracy Lynn Edwards assumed the role of lead investigating officer. After Detective Edwards concluded her assistance to federal agents in an unrelated child pornography investigation, law enforcement began investigating Mr. Bellotte for possession of child pornography and suspected sexual exploitation of a minor. The officers then determined that Mr. and Mrs. Bellotte possessed concealed carry permits. The officers therefore believed that the Bellottes had multiple firearms in their home.

Believing that the situation was urgent, Detective Edwards completed an application for a search warrant for the Bellottes' home around 7:30 P.M. on May 31. The suspected crime cited in the search warrant application was *not* possession of child pornography, but rather use of a minor in filming sexually explicit conduct, undoubtedly a form of sexual child abuse. *See* W. Va. Code § 61-8C-2(a) ("Any person who causes or knowingly permits, uses, persuades, induces, entices or coerces such minor to engage in or uses such minor to do or assist in any sexually explicit conduct shall be guilty of a felony when such person has knowledge that any such act is being photographed or filmed."). The magistrate reviewed and signed the warrant between 8:30 and 9:00 P.M.

Detective Edwards believed execution of the search warrant presented a high risk of danger for essentially two reasons:

> I believed that the Bellottes had weapons. I also believed that this child existed at their residence, even though I didn't know if it was a neighbor's child or if it was their child.
>
> . . .
>
> Child pornography—and I do feel that if, in fact, someone were responsible for kidnapping a child, that it would [be] a very dangerous situation.

Thus, Detective Edwards sought and obtained departmental approval to use a tactical special operations team, which executed a no-knock entry into the Bellottes' home shortly after 10:00 P.M. on May 31.

At the time of entry, a magistrate had found probable cause to believe that evidence of sexual child abuse existed in the Bellottes' home, and the officers reasonably believed that multiple firearms were in the home because of the Bellottes'

concealed carry permits. Based on this information, Detective Edwards and the other officers believed that executing this search warrant presented a high risk of danger to the entering officers and the child victim potentially located within.* If the officers' fear of danger had been reasonable, the no-knock entry would have been lawful. *Richards*, 520 U.S. at 391. I concur with the majority, however, and conclude that the officers' fear was not sufficiently supported to justify their dynamic no-knock entry into the Bellottes' home. While the officers' no-knock entry was unlawful, no preexisting case law *clearly established* the unlawfulness of their conduct under the circumstances here such that a reasonable officer would have known that he was "transgressing" a "bright line." *Campbell*, 483 F.3d at 271.

Indeed, at the time of entry in this case, there was congressional and judicial emphasis on combating the harm to victims of child pornography and sexual exploitation offenses. *See, e.g., New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."); *United States v. MacEwan*, 445 F.3d 237, 249-50 (3d Cir. 2006) ("The congressional findings underlying [18 U.S.C.] § 2251 repeatedly stress that child pornography is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved.") (internal quotation

---

*My fine colleagues in the majority suggest that the officers have offered no "objective basis" in this appeal for a belief that a child victim was in the house. The record on appeal contains a photograph showing what two Virginia police officers and at least three West Virginia police officers believed to be an adult's penis beside the face of a very young girl, evidence of Mr. Bellotte's defensive and evasive behavior at the Wal-Mart store, and Detective Edwards' deposition testimony. This evidence, most assuredly, provides an "objective basis" to believe that a child victim *could be* in Mr. Bellotte's home. In light of that belief, coupled with the reasonable belief that Mr. Bellotte had firearms within reach, I cannot conclude that the unlawfulness of this no-knock entry would have been apparent to any reasonable officer.

marks omitted); *see also United States v. Matthews*, 209 F.3d 338 (4th Cir. 2000) (rejecting a First Amendment bona fide reporter defense to a charge of interstate transportation of child pornography). With that legal backdrop, and given the officers' belief that a child victim and deadly weapons were likely in the Bellottes' home, I cannot conclude that in light of preexisting law, it would have been clear to any reasonable officer that a no-knock entry violated the Constitution.

The majority opinion contends that there is "nothing in the appellants' brief that even purports to suggest that Mr. Bellotte somehow kept a child victim in the house with his family." However, I find much in the briefs before this Court to reflect the parties' acknowledgement that the police officers held such a belief. The officers' brief states that the "Bellottes alleged that the search warrant was invalid because . . . (5) the search warrant was obtained by making a false statement." *Opening Brief* at 5. Indeed, the Bellottes in their brief confirm this allegation:

> In any event, Detective Edwards, as had others, wrongly concludes that this 35-year-old female is a 5 or 6-year-old child. Her imagination kicked in and she concluded without any foundation that this may be a kidnapped child being held in the non-existent basement at [the Bellottes' home].
>
> . . . In spite of Detective Edwards' knowledge of the Bellotte children being at home, *in spite of knowing that child molesters rarely ever engage in their nefarious schemes around their own children*, Detective Edwards sought a search warrant.

*Brief of Appellees* at 14-15. The Bellottes' brief further states that Detective Edwards "defended her decision to carry out a nighttime search with a SWAT team as justified by the fact that Mr. and Mrs. Bellotte possessed concealed weapon per-

mits and *the fact that the police did not know if the 'child' was in the house 'or somewhere else.'" Id.* at 16.

Additionally, this is an appeal from the denial of summary judgment on qualified immunity. Summary judgment is not to be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Upon reviewing, de novo, whether the district court erred by not granting summary judgment, I would not limit the evidence to be considered to solely that which is presented in the appellants' briefs. In order to determine whether preexisting law made the unlawfulness of this entry apparent, "the facts must be evaluated from the perspective of a reasonable officer at the scene, and the use of hindsight must be avoided." *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008) (quotation marks omitted).

The preexisting case law the majority cites does not establish that the circumstances confronted by these officers could not support a reasonable suspicion of danger. *See Ornelas v. United States*, 517 U.S. 690, 698 (1996) ("It is true that because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be a useful 'precedent' for another.") (citation and quotation marks omitted). *United States v. Grogins*, 163 F.3d 795 (4th Cir. 1998), like a number of cases on which the majority relies, is far removed from the facts of this case. The suspect in *Grogins* was a notorious drug dealer with a history of violence. Police performed a no-knock entry into a suspected "stash house" where police believed the suspect kept his drug inventory. *Id.* at 796. The house, however, belonged to an acquaintance of the suspect. When police entered they found a large quantity of drugs, but the only person present was the acquaintance, who was charged with possession with intent to distribute a controlled substance. *Id.* at 797. *Grogins* did little to inform the officers

here whether a no-knock entry into a suspected child abuser's home—where the suspect, multiple firearms, and the child victim were believed to be present—was lawful.

*United States v. Singleton*, 441 F.3d 290 (4th Cir. 2006), is a similarly distinguishable drug case. There, the officers obtained a no-knock search warrant predicated upon three general categories of allegedly exigent circumstances: 1) the suspect's remote criminal history included violence; 2) a generalized concern about the tendency to violence in drug-ridden neighborhoods; and 3) a generalized concern about the violent tendencies of drug dealers. The court ultimately upheld the search based on good–faith reliance on the warrant. However, the court suggested in dictum that the no-knock entry might not have been justified because the defendant's remote criminal history was the only specific factor that distinguished "this particular search from many others that police conduct on a daily basis." *Id.* at 294. By contrast, the officers in this case had particularized information leading them to believe that child abuse was occurring in the Bellottes' residence, where multiple firearms were likely present. The circumstances here are therefore a far cry from the routine drug investigation in *Singleton*.

*Gould v. Davis*, 165 F.3d 265 (4th Cir. 1998), did little more to put the officers in this case on notice that the circumstances they confronted were insufficient to justify a no-knock entry. In *Gould*, police executed a no-knock entry into the home of the plaintiff, the father of a suspected armed robber, while the suspect was in police custody. *Id.* at 268. The no-knock warrant was issued based on the violent nature of the suspect's crimes and probable cause to believe that handguns would be found in the plaintiff's house. *Id.* At the time of entry, the officers knew that the plaintiff was not involved in the armed robberies and that he had no criminal history. The plaintiff was shot during entry and he sued under Section 1983. This Court held that the officers were not entitled to qualified immunity because "any reasonable officer would

have rejected as inconsistent with clearly established law in 1992 . . . a belief that [the plaintiff] might use a weapon because of the criminal propensities of his children." *Id.* at 271. This holding did not clearly establish the unlawfulness of the no-knock entry here, where the suspect was believed to be in the home and was under investigation for child abuse.

There is simply no case law that speaks to the presence or absence of exigent circumstances in the context of a child abuse investigation in which the child victim and multiple firearms are believed to be in the suspect's custody. Thus, there were no "bright lines" demarcating the limits of a reasonable suspicion of danger under these circumstances. *Campbell*, 483 F.3d at 271. "If the law at [the time of entry] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Although the law is now settled as to any similar entries arising in the future, I must conclude that no preexisting law clearly established the unlawfulness of this particular entry. Therefore, I would hold that the officers are entitled to qualified immunity on the no-knock entry claim.